# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Francis P. Maybank and Jane H.P. Maybank, as trustee for the Francis P. Maybank Family Insurance Trust, Plaintiffs,

Of whom Francis P. Maybank is the Respondent/Appellant,

v.

BB&T Corporation, Branch Banking and Trust Company, Successor in merger to Branch Banking and Trust Company of SC, and Sterling Capital Management, LLC, Successor in merger to BB&T Asset Management, LLC, Appellants/Respondents.

Appellate Case No. 2014-002638

------

Appeal from Greenville County
The Honorable Edward W. Miller, Circuit Court Judge

------

Opinion No. 27640
Heard November 3, 2015 – Filed June 3, 2016

------

**AFFIRMED IN PART AND REVERSED IN PART**

------

C. Mitchell Brown, D. Larry Kristinik, Brian P. Crotty, Michael J. Anzelmo, all of Columbia, and William S. Brown, of Greenville, all of Nelson Mullins Riley and Scarborough, LLP, for Appellants/Respondents.

Mitchell Willoughby, John M.S. Hoefer, Tracey C. Green, Chad N. Johnston, all of Willoughby and Hoefer, P.A., of Columbia, and Bruce W. Bannister, of Bannister,

Wyatt and Stalvey, LLC, of Greenville, for Respondent/Appellant.

---

**ACTING CHIEF JUSTICE HEARN:** This appeal arises from a total verdict of $17,199,306 rendered in favor of Francis P. Maybank for claims sounding in contract, tort, and the South Carolina Unfair Trade Practices Act (UTPA). Maybank brought this action alleging he received faulty investment advice from Branch Banking and Trust (BB&T) Company (the Bank) through BB&T Wealth Management (Wealth Management) and BB&T Asset Management (Asset Management), all operating under the corporate umbrella of BB&T Corporation (collectively, Appellants). Appellants appeal on numerous grounds, and Maybank appeals the trial court's denial of prejudgment interest. We affirm in part and reverse in part.

## FACTUAL/PROCEDURAL BACKGROUND

### I.    BACKGROUND

Because of the numerous BB&T entities involved and their intertwined relationships, we begin by briefly highlighting the role of each Appellant. The Bank is a subsidiary of BB&T Corporation and is its largest asset—comprising ninety-eight percent of the corporation's holdings. The Bank offers traditional banking services along with insurance, trust, and wealth management services. Wealth Management oversees financial portfolios, keeping abreast of clients' financial situations, needs, and risks. Asset Management, an independent corporate entity, through investment advisors or brokers, makes recommendations about investment strategies and products as well as assists clients in entering investments with third parties.

In 1999, the Bank offered well-established commercial middle-market lending, investment counseling, insurance, and trust services. As part of an effort to offer increasingly sophisticated and diversified financial products, it acquired Scott & Stringfellow brokerage firm, which specialized in corporate finance, equity underwriting and distribution, and advisory services.

The Bank continued to follow an expansion strategy, and in 2001, it became interested in acquiring Southeastern Trust Company (Southeastern), an independent investment firm with offices in Greenville, Columbia, Charleston, and Anderson, which had been founded by Maybank. Southeastern served as the

trustee or personal representative for clients' wills and trusts in addition to acting as investment manager and advisor to individuals, companies, and profit-sharing trusts.

Raised in South Carolina, Maybank graduated from Harvard University and moved to New York City in 1957 to work for Fiduciary Trust Company. He later operated his own trust firm on Wall Street for many years, returning to South Carolina in 1989 to found Southeastern. In November 2001, Maybank sold his interest in Southeastern to the Bank, receiving 246,000 shares of BB&T Corporation stock in exchange. As a result of the acquisition, all of Southeastern's employees began working for the Bank, including Maybank, who became a senior vice president in the Trust Department with a five-year employment contract and an annual salary of $100,000. His duties included promoting the Bank's services to Southeastern's existing customers and overseeing client transition to the Bank. This was a shift from his previous work experience as a trust officer. In order to avoid substantial capital gains taxes due to the high value of the BB&T Corporation stock, Maybank placed his newly acquired stock in his brokerage account with Scott & Stringfellow. This allowed him to defer the tax liability and to enjoy annual dividends of approximately $400,000.

In 2004, the Bank created Wealth Management, which included the Trust Department in which Maybank worked. The former Southeastern clients who transferred to the Bank's Trust Department became Wealth Management clients. Around the same time, the Bank, through Asset Management, began to market "alternative investment strategies" to clients with substantial net worth and highly concentrated stock positions.

In order to effectuate these alternative investment strategies, clients executed a wealth management agreement (WMA), establishing a contractual relationship between the Bank and Asset Management. Under the WMA, the Bank served as the advisor for the designated assets and thereby had the ability to advise and provide professional guidance on available BB&T products. Wealth Management portfolio advisors served as liaisons between clients and Asset Management. Specifically, Wealth Management oversaw the portfolio account, serving as its custodian. By signing the WMA, a client hired Asset Management to handle the discretionary account and serve as the account's investment advisor. Under its terms, the Bank had total discretion to invest in securities from the Wealth Management portfolio.[1]

---

[1] Although Wealth Management portfolio advisors were neither trained nor

One of the new strategies touted by the Bank and Asset Management included a variable prepaid forward contract (Prepaid) that was directed at customers with concentrated stock positions. A Prepaid is an investment contract by which a stock is sold to an investment bank for an upfront payment of approximately seventy-five to ninety percent of its value. Significantly, title to the stock is not transferred for two to three years, thereby deferring capital gains taxes and allowing the customer to receive dividends and the benefit of appreciation. A Prepaid provides four meaningful benefits for its holder: (1) protection against a collapse of the stock, (2) immediate liquidity, (3) an opportunity to partially participate in future gains, and (4) an opportunity to receive dividends.[2]

In mid-2006, Maybank attended a meeting between a long-time client of his and representatives from Wealth Management and Asset Management. The purpose of the meeting was to discuss the client's concentrated position in a particular stock and the advisability of Prepaids. Kristopher Kapoor attended the meeting as a portfolio manager for Asset Management to address proceeds in the event the client decided to purchase a Prepaid. Anthony Mahfood, a Wealth Management advisor, was also present. Although Maybank had previous knowledge about Prepaids through written presentations circulated within BB&T, it was this meeting that piqued Maybank's personal interest in this alternative investment product.

---

licensed to make any trades or investments, they were experienced in BB&T's platform investment strategies and products. According to David Fisher, head of Wealth Management, a portfolio manager's job was to be an "issue spotter" so as to identify opportunities and inform clients of potential BB&T products that could best serve clients' needs. In Fisher's words, portfolio managers possessed a general knowledge that was "a mile wide and an inch deep." Asset Management's role was to connect the client to a given product. Essentially, Asset Management served as an investment advisor, for which it received compensation, but it neither made the trade nor sold a security. Asset Management served as a middle-man between the client and groups like Scott & Stringfellow, which executed the security transaction.

[2] In addition to fees connected with a Prepaid and any subsequent rollovers, it is undisputed a Prepaid is a risky strategy and a hedge. It has no diversification and may not effectively minimize a client's risk—primarily because future dividends could be reduced or eliminated by the company.

In light of his concentrated position in BB&T Corporation stock, Maybank spoke with Kapoor following the meeting about his interest in entering into a Prepaid, along with his investment objectives and risk tolerance.[3] As of 2006, the 246,000 shares of BB&T stock he had received in 2001 remained in his brokerage account with Scott & Stringfellow. At Kapoor's recommendation, Maybank communicated with Mahfood, who then asked Shawn Gibson, a member of Asset Management's alternative investment team, to prepare illustrations of the anticipated Prepaid's terms.

In July 2006, Maybank was given a Concentrated Stock Risk Management Addendum (Addendum), which outlined a general description of the strategies of various single-stock products, including a Prepaid. Also included within the Addendum was the fee schedule to use the services of "BB&T professionals," which explained a "one-time-upfront advisory fee from your Account, based upon the principal value of the investments." The Addendum stated it was an addition to the WMA between the Bank, the advisor, and Maybank, even though Maybank had not yet executed a WMA with the Bank and Asset Management.

On August 11, 2006, Wealth Management presented Maybank with a letter (Approval Letter), which approved Maybank entering into a Prepaid with BB&T.[4] The Approval Letter was written by Mahfood to Patricia Oliver, the Executive Vice President, Secretary, and General Counsel for BB&T Corporation, but signed by both Mahfood and Oliver. Express authorization by BB&T Corporation was necessary because the BB&T Code of Ethics prohibited BB&T employees from using BB&T Corporation stock in any transaction deemed to be speculative, including Prepaids. The letter stated "a [Prepaid] may allow Mr. Maybank to reduce the risk of his concentrated position in BB&T, while raising cash to create a diversified portfolio." It further stated "implementation of this [Prepaid] will protect Mr. Maybank from an extraordinary reduction in the overall value of his investment portfolio and resulting net worth. It will also help him achieve important diversification goals we have discussed throughout the financial planning process." Oliver signed the Approval Letter as Executive Vice President, Secretary, and General Counsel for BB&T Corporation. A handwritten note under

---

[3] Maybank had significant life expenses at this time, including paying for graduate school and private school for his children and grandchildren, as well as expenses connected with owning two farms, a home in Charleston, and a horse-raising business.

[4] Although the Approval Letter uses Maybank's name throughout, as discussed *infra*, it is actually a form letter.

Oliver's signature stated: "This approval by General Counsel is conditioned on Mr. Maybank not purchasing additional shares of BB&T Corporation under proceeds from the [Prepaid]."

After being presented with the Approval Letter, Maybank executed a Prepaid with Bear Stearns—a three-year contract in which Maybank pledged 220,000 shares of BB&T Corporation stock with a value of $9,318,364 in exchange for upfront proceeds of $7,120,000. The Bank charged Maybank $32,614 for the advice and recommendation to enter into the first Prepaid. Of the $7,120,000 in upfront proceeds derived from the Prepaid, $2,470,000 was applied by BB&T to Maybank's margin debts from Southeastern. The remaining $4,650,000 was placed into a Wealth Management portfolio account, notwithstanding the fact that at this point in time the account was still not subject to any WMA.

Subsequently, on August 23, 2006, Maybank entered into a WMA with the Bank and Asset Management. The WMA served as the umbrella for the various services BB&T was offering to Maybank through Wealth Management and Asset Management. The WMA established the Bank would (1) gather information about the client's investment objectives, risk, financial situation, and needs; (2) make a recommendation to the client; and (3) coordinate and supervise the account. The WMA stated the Bank will do what is in the "best interest" of the client. Further, the WMA also governed the portfolio account with the $4,650,000 in proceeds from the Prepaid after Maybank's margin debt had been paid.

By the end of 2008, the value of BB&T Corporation stock had dropped precipitously as a result of the national financial crisis. Due to his concentrated stock position, Maybank suffered a considerable loss. Accordingly, Maybank was concerned about his income stream, which had been supplied by the rather substantial dividends paid by BB&T Corporation stock and tied to the Prepaid. This concern was further fueled by the fact that the initial Prepaid would expire in August 2009. Maybank therefore discussed the expiration of the first Prepaid with Mahfood and Gibson, primarily focusing on whether he should roll the first Prepaid into a second one.

In January 2009, Appellants assisted Maybank in the execution of a second Prepaid with Deutsche Bank, a global investment bank and securities trading and brokerage firm. When the transaction was completed, Maybank discovered he had incurred costs and fees of nearly $1,300,000 from the roll-over. Thereafter, during the second quarter of 2009, BB&T Corporation decreased its dividend

significantly. As a result, Maybank received an annual dividend of $230,000, in contrast to the approximately $400,000 annual dividend he had been receiving previously.

In August 2010, Maybank requested a meeting with personnel of the Bank to discuss the significant losses he sustained, which he believed were the result of mismanagement and a failed investment strategy. He met with Fisher, the head of Wealth Management, and Ross Walters of the Greenville division. At that time, he believed he had been damaged by Appellants' mismanagement in the amount of $3,500,000. Dissatisfied with Appellants' response, Maybank decided to pursue legal action.

## II.    LITIGATION

In December 2011, Maybank filed this lawsuit against Appellants, alleging numerous causes of action arising from Appellants' financial investment advice, including breach of fiduciary duty, breach of contract, negligence, breach of contract accompanied by a fraudulent act, constructive fraud, violations of the South Carolina Uniform Securities Act of 2005 (Securities Act), and violations of the UTPA. Maybank asserted that in preparation for his retirement, he engaged Appellants to develop an investment plan that reflected his goals of diversification, steady income, tax sheltering, and the ability to protect his wealth for his grandchildren through the Francis P. Maybank Family Life Insurance Trust (the Trust), established in 1993. He contended Appellants' investment plans were aggressive, risky, and involved a complex system of derivative trading with BB&T Corporation stock—which he characterized as an uncommon investment approach for someone seeking financial advice for retirement. Maybank alleged he lost substantial sums of money because of this faulty investment advice.

Following the removal of this action to federal district court by Appellants and the subsequent remand, the parties jointly moved for the case to be assigned to the Greenville Business Court (then) Pilot Program. Maybank filed an amended complaint, which added the Trust as a plaintiff.[5]

In November 2012, Maybank received a letter from Wealth Management stating he was being refunded for the one-time advisory fee that was charged in connection with the services Asset Management had provided for the Prepaids.

---

[5] The jury did not return a verdict on any claims for the Trust, and the Trust did not appeal.

The letter (Refund Letter) stated, "Recently, as part of a review of client accounts we discovered that a fee was charged to your account that we wish to refund to you. While we are not required to rebate these fees, we choose to do so as a reflection of our corporate values." It also explained, "This fee would not have been charged under our current billing practices." Maybank was returned fees in the total amount of $79,682.19.[6]

The Refund Letter did not disclose that the refund of fees was actually motivated by an inquiry by the Securities and Exchange Commission (the SEC) into Asset Management's fee practices. At the time of the refund, the SEC expressed concerns over the upfront charges and associated fees for selling alternative investments. This investigation was qualified both as "out of the bounds" of the SEC and in a "gray area" of regulation. According to Fisher, the investigation was prompted because the fees charged were "broker-esque." Maybank's refund was part of approximately $1,000,000 in fees refunded by Wealth Management.

Essentially, Maybank's theory of the case was that Appellants' recommendation of alternative investment strategies and products like Prepaids, which generated fees and profit for the Bank and BB&T Corporation, caused grave financial damage to clients like Maybank. He contended he relied on Appellants to advise him in their capacity as fiduciaries. Maybank alleged Appellants willfully and wantonly deceived him. He specifically claimed he relied on two key documents in trusting Appellants: the Approval Letter and the WMA.

Conversely, Appellants characterized the case as one involving a sophisticated businessman with fifty years in the investment advisory industry who fully appreciated the risks involved in his investments. They claimed it was Maybank who ultimately decided a Prepaid was an ideal solution to his retirement needs. Appellants pointed to the fact that Maybank went on to unwind and roll over his Prepaid three more times himself—without any involvement by BB&T. Moreover, according to Appellants, Maybank received $1,500,000 in dividends during the six years the Prepaids were in effect, monies he would never have received had he sold his BB&T Corporation stock in 2006.

---

[6] Because Maybank had two Prepaids, he was returned two separate fees.

## III.  EVIDENCE PRESENTED

At trial, Maybank testified that based on his employment with the Bank, he believed Appellants were responsible and knowledgeable on both financial matters and fiduciary interests, and consequently, he sought their advice and services. He testified he expressly told Appellants about his financial concerns and he wanted to secure his assets.  Maybank contended Appellants represented they had special expertise in alternative investment strategies, and they recommended he enter into a Prepaid as a way to avoid risk, protect his dividends from his BB&T Corporation stock, address his debt issues, defer his tax liability, and generate cash proceeds.  Maybank testified he had no prior experience with or real knowledge of Prepaids.  He further testified he relied on the advice of Appellants as his fiduciaries because his prior experience had been in the limited capacity of managing trusts and investments like stocks and bonds, not in the areas of options or other derivative products.

Maybank also presented the video deposition testimony of Walters, head of Greenville's Wealth Management division, who stated that while he held a Series 7 broker license and Series 24 broker license, and although he had general knowledge as an investment broker, he did not have the training or expertise to provide advice or make recommendations about any particular investment strategy. Walters further agreed he did not know how to advise a client with a concentrated stock position.  Moreover, he admitted he did not have the knowledge or experience to inform a client how to assemble a well-managed and balanced portfolio.

Maybank introduced the Approval Letter to demonstrate the selling points used by BB&T for the strategies and representations made to him.  Maybank testified he relied on the Approval Letter in deciding to enter into the first Prepaid in 2006.  He further stated he believed Appellants had thoroughly researched the financial products and determined a Prepaid was best for his specific situation, as outlined in the Approval Letter.  Maybank testified that based on the language of the Approval Letter, he assumed it was specifically tailored to him and his needs; however, he later learned it was merely a form letter.  Maybank submitted into evidence the form letter that was used for all customers in Maybank's situation, which stated analysis and review had been done for the customer whose name was then filled into a blank.

Maybank also submitted the WMA as evidence of the expansion of the Bank's fiduciary role with Maybank through Wealth Management and Asset Management. Maybank put forth evidence Wealth Management never intended to fulfill—and could not fulfill—the duties and obligations outlined in the WMA. For example, Walters's deposition testimony revealed that Wealth Management did not gather the information required under the WMA. Further, he testified Wealth Management did not advise; rather, that service was provided by Asset Management based on the Bank's policies and procedures. Walters also testified he believed someone within the Bank or Asset Management would have addressed the duties and obligations outlined in the WMA.

Maybank also established, through the deposition testimony of Walters, that the Bank knew at the time Maybank entered into the WMA that the contract contained errors, misstatements, and deliberate misrepresentations. Walters testified he knew wealth advisors were using the inaccurate WMA, but he did not review the WMA signed by Maybank and therefore did not question it. Walters testified because Maybank was a wealth advisor, he would have known Asset Management handled that portion of the advising and the transaction. He stated it was Maybank's job to know such information and if he did not, he was "incompetent." Walters testified he believed the contract was fulfilled in principle. He claimed the errors in the WMA were the result of an "oversight on our attorneys' part."

Maybank entered the Refund Letter into evidence to further his theory Appellants engaged in unfair and deceptive business practices. Appellants' representatives testified repeatedly the Refund Letter was indicative of their corporate values, and it chose to refund the fees because they were inconsistent with the 2012 billing practices.

Three expert witnesses also testified for Maybank: Professor John Freeman, Dr. Craig McCann, and Dr. Oliver Wood. Their testimony covered the topics of fiduciary relationships, securities, and damages.

In their defense, Appellants painted a markedly different picture. They concentrated on Maybank's professional experience, the fact he was informed and aware of the contracts he was entering, and their theory that Prepaids were the only option for Maybank based on his financial circumstances. Appellants also focused extensively on the role Wealth Management and Asset Management employees played in the execution of the services rendered.

Testimony by the Bank's employees suggested Maybank was not open to advice and was set in his ways. For example, Kapoor explained that during his meeting to discuss Maybank's goals and overall financial situation, he realized Maybank was a "100 percent equity guy" who preferred stocks. Kapoor acknowledged that a more diversified portfolio would have been a better option for Maybank, and they discussed the importance of diversification multiple times. A personal trust specialist for Wealth Management and a former employee of Southeastern testified that Maybank's financial philosophy over the years was "all equities." Gibson testified he generally remembered Maybank being involved in conversations about how to guide the transaction and how it would be structured. He also stated Maybank never indicated he was giving complete discretion to Appellants to determine how best to handle his concentrated stock position.

Appellants additionally put forth evidence and testimony Maybank was fully informed about the contracts he entered. They submitted into evidence extensive documentation provided to Maybank in his capacity as a client and in his role as a wealth management advisor. For example, Appellants entered into evidence sales presentations and materials on alternative investments and Prepaids given to Wealth Management and Asset Management employees. This evidence was used by Appellants to support their argument of Maybank's knowledge, but on cross-examination, Maybank's counsel used the evidence to support Maybank's contention the advisors possessed inadequate information on Prepaids. The jury also heard from multiple employees who testified they were not allowed to provide investment advice. Additionally, Appellants presented testimony that Gibson insisted Maybank seek advice from a tax lawyer before entering into the first Prepaid, and that Maybank proceeded to unwind and roll over his Prepaid three additional times without any assistance from BB&T.

To refute Maybank's reliance on the Approval Letter, Mahfood testified he believed the letter was a necessary part of the paperwork required to execute the recommended strategy because Maybank was an employee of the Bank and held concentrated stock in BB&T Corporation. Mahfood acknowledged he did not conduct any analysis to confirm any of the promises or representations made in the letter even though he signed it. This was supported by Kapoor's testimony that wealth advisors were not authorized to make any recommendations to Maybank. Mahfood explained he would have spoken up if something appeared "out of whack." Subsequently, Mahfood testified he did not analyze or formally review Maybank's file. Similarly, Walters explained at trial he could not provide investment advice.

In addressing the obligations of the WMA, Walters testified at trial that the Bank had the responsibility of gathering information about a client's investment objective and risk tolerance, making a recommendation to the client regarding an investment program, and supervising the services of the investment advisor. He stated that each obligation of the WMA was fulfilled by either the Bank or Kapoor of Asset Management. On cross-examination, however, Walters conceded the WMA stated "the [B]ank shall" perform the three responsibilities outlined in the WMA, not Asset Management. Further, he agreed the responsibilities were not completed by the Bank nor could they be completed by the Bank.

Appellants suggested Maybank's only viable option was to enter into a Prepaid because he was living beyond his means. They emphasized that rather than cutting expenses, Maybank chose to borrow on the margin. By July 2006, Maybank had a margin debt of $2,700,000 secured by his BB&T Corporation stock, which was invested at Scott & Stringfellow.[7] Because Gibson admitted he did not have an independent recollection of his discussion with Maybank, he testified he assumed he would have believed a Prepaid was a good strategy for Maybank.

Appellants' financial expert, Robert Thorne, testified that as of July 2006, Maybank would have been in a "predicament" if he sold his stock because it was trading extremely low and he would have faced significant capital gains taxes. Thorne further stated that if Maybank sold the stock, he would lose the dividend, which was providing an annual income of $400,000. Therefore, it was Thorne's opinion that taking a "hedge" on a Prepaid was Maybank's best option.

Because of the securities violation claim, Appellants devoted considerable effort in discovery and at trial to establish their employees did not advise Maybank or sell securities. Paul Merolla, an employee of Asset Management, testified that Asset Management and its employees did not buy and sell securities for its clients or for its own accounts. He further testified Asset Management was "simply advising Maybank as to managing his asset pool." The actual sale was done by a myriad of separate companies. In Maybank's particular circumstance, the Prepaids were contracted with Bear Stearns and Deutsche Bank. Thus, to avoid liability on the securities claim, Appellants were adamant that no BB&T entity sold securities.

---

[7] Evidence was introduced that this debt was related to outstanding business debt from Southeastern.

Appellants moved for a directed verdict at the close of Maybank's case and again at the close of all evidence. Notably, Appellants argued, in an effort to defeat the securities claim, that: "[Maybank and the Trust] have not presented any evidence that BB&T Corporation offered or sold any securities. They have also not presented any evidence that any securities were offered or sold to the Trust by any [Appellants]." Conversely, to defeat the UTPA claim, Appellants' counsel argued that because a Prepaid was a security, the securities exemption in the UTPA controlled. Maybank and the Trust voluntarily dismissed the claims for negligence and fraud. The trial court denied Appellants' motions.

## IV. VERDICT

The jury returned a verdict in favor of Maybank and against all Appellants on five claims: (1) breach of contract, (2) breach of fiduciary duty, (3) violation of the UTPA, (4) constructive fraud, and (5) negligent misrepresentation.[8] The jury returned a verdict in favor of Appellants on all other claims, including the securities claim. The jury awarded Maybank $3,100,000 in actual damages and $5,000,000 in punitive damages against all Appellants.

Appellants then moved for judgment notwithstanding the verdict (JNOV) on forty grounds and for a new trial absolute or, in the alternative, for a new trial *nisi remittitur*. Appellants also filed a motion to compel an election of remedies. Maybank filed motions for attorneys' fees and costs and to treble damages under the UTPA. Appellants opposed the motions and filed three motions directed to Maybank's requests for additional UTPA remedies.

The trial court denied all of Appellants' motions. The trial court found the jury's punitive damages award of $5,000,000 was appropriate. Further, the trial court found the evidence supported the jury's conclusion a violation of the UTPA had occurred. The trial court found Appellants' conduct to be both willful and knowing and therefore granted Maybank's motion to treble the award of actual damages from $3,100,000 to $9,300,000. Further, the trial court granted Maybank's motion for attorneys' fees and costs under the lodestar analysis,[9]

---

[8] Significantly, the trial court used the verdict form created by Appellants with minimal modifications.

[9] The lodestar analysis "is designed to reflect the reasonable time and effort involved in litigating a case, and is calculated by multiplying a reasonable hourly rate by the reasonable time expended." *S.C. Dep't of Transp. v. Revels*, 411 S.C. 1,

reducing the request by twenty percent and awarding attorneys' fees of $2,654,295 and costs of $245,011.  Appellants' motion for an election of remedies was denied because the trial court found the evidence supporting the UTPA verdict was distinct from the conduct supporting the common law causes of action for which punitive damages were awarded.  Thus, the trial court entered a judgment for $17,199,306 against all Appellants.  Finally, the trial court denied Maybank's motion for prejudgment interest.

Appellants filed a motion to alter or amend judgment, which the trial court denied, and Appellants and Maybank appealed.  This Court certified the appeal pursuant to Rule 204(b), SCACR.

## ISSUES PRESENTED[10]

I.      Whether the trial court erred in finding personal jurisdiction over BB&T Corporation.

II.     Whether the trial court erred in denying Appellants' motion for a new trial based upon Freeman's lack of qualification to testify as to the Prepaids.

III.    Whether the trial court erred in denying Appellants' motions for JNOV as to the UTPA, breach of fiduciary duty, breach of contract, negligent misrepresentation and constructive fraud, speculative damages, the statute of limitations, and punitive damages.

IV.     Whether the trial court erred in trebling the actual damages under the UTPA.

V.      Whether the trial court abused its discretion in awarding attorneys' fees and costs to Maybank under the UTPA.

VI.     Whether the trial court erred in denying Maybank's motion for prejudgment interest.

---

5, 766 S.E.2d 700, 702 (2014) (quoting *Layman v. State*, 376 S.C. 434, 457, 658 S.E.2d 320, 332 (2008)).

[10] Appellants raised ten issues on appeal with numerous subparts which we have condensed to these six issues.

## LAW/ANALYSIS

### I. PERSONAL JURISDICTION

Appellants argue the trial court lacked personal jurisdiction over BB&T Corporation and therefore the claims against it should be dismissed. Specifically, they contend BB&T Corporation is a North Carolina corporation with no offices, employees, or operations in South Carolina, and at no time did BB&T Corporation provide any services to Maybank or other South Carolina customers. As such, they assert finding personal jurisdiction was improper, as South Carolina courts have no authority to enforce a decision over an out-of-state business with no significant ties to the State. Because we find BB&T Corporation waived its right to contest personal jurisdiction by actively participating in litigation, we decline to reach the merits of Appellants' arguments.

Personal jurisdiction is a court's authority to rule and enforce a decision over the parties of a lawsuit. *Limehouse v. Hulsey*, 404 S.C. 93, 104, 744 S.E.2d 566, 572 (2013). Personal jurisdiction over a nonresident is resolved upon the facts of each case. *State v. NV Sumatra Tobacco Trading, Co.*, 379 S.C. 81, 88, 666 S.E.2d 218, 221 (2008).

Maybank argued BB&T Corporation waived its right to assert a personal jurisdiction defense because it failed to timely contest personal jurisdiction in a motion to dismiss and actively participated in litigation for more than one year. The trial court agreed, finding BB&T Corporation waived personal jurisdiction in failing to argue their motion until a month before trial. Alternatively, the trial court found there was sufficient evidence to invoke personal jurisdiction over BB&T Corporation.

Rule 12(h)(1), SCRCP, provides a defense is waived if "it is neither made by motion under this rule or included in a responsive pleading or an amendment." No South Carolina case has squarely addressed whether personal jurisdiction is waived if a party continues to participate in litigation after challenging personal jurisdiction in their initial responsive pleading to a court. However, the language of Rule 12(h)(1) is substantially similar to the Federal Rules of Civil Procedure. In construing the South Carolina Rules of Civil Procedure, our Court looks for guidance to cases interpreting the federal rules. *Gardner v. Newsome Chevrolet-Buick, Inc.*, 304 S.C. 328, 330, 404 S.E.2d 200, 201 (1991).

A number of federal courts have determined "a delay in challenging personal jurisdiction by motion to dismiss may result in waiver, even where the defense was asserted in a timely answer.'" *Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 60 (2d Cir. 1999) (citation omitted) (internal quotation and alteration marks omitted); *see also Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1318 (9th Cir. 1998) ("Rule 12(h)(1)[, FRCP,] specifies the minimum steps that a party must take in order to preserve a defense."); *Continental Bank, N.A. v. Meyer*, 10 F.3d 1293, 1296–97 (7th Cir. 1993) (finding waiver of personal jurisdiction defense by defendant's conduct, though acknowledging the waiver specifically provided for by Rule 12(h), FRCP, did not occur); *Yeldell v. Tutt*, 913 F.2d 533, 538 (8th Cir. 1990) (finding Rule 12(h), FRCP, "'sets only the outer limits of waiver; it does not preclude waiver by implication.'" (quoting *Marquest Med. Prods. v. EMDE Corp.*, 496 F. Supp. 1242, 1245 n.1 (D. Col. 1980))).

Considerable pretrial activity occurred in this case. BB&T Corporation timely answered and addressed personal jurisdiction by stating it "reserve[d] its objection based on the Court's lack of in *personam* jurisdiction." Following this reservation, BB&T Corporation did not wait for the trial court to rule whether it could properly exercise personal jurisdiction over BB&T Corporation. Rather, BB&T Corporation, along with the other Appellants, removed the case to federal court. During this time, BB&T Corporation further engaged in the litigation by filing an amended answer to Maybank's amended complaint, filing a corporate disclosure, opposing remand, and opposing a motion for attorneys' fees.

Moreover, following the federal court's remand to state court, BB&T Corporation continued to participate in litigation and discovery, which spanned more than one year, and in fact BB&T Corporation submitted its own responses to discovery requests separate from the other Appellants. After its active participation in the extensive discovery leading up to trial, BB&T Corporation reasserted this defense a mere one month prior to the start of trial.

In our opinion, BB&T Corporation gambled that it could argue personal jurisdiction on the eve of trial after actively participating in litigation over the course of two and a half years. After considering the circumstances of this case, we find BB&T Corporation waived any possible personal jurisdiction defense, and it was well within the trial court's discretion to find BB&T Corporation waived its personal jurisdiction defense.

## II.    EXPERT QUALIFICATION

Appellants argue the trial court erred in permitting Freeman to testify as an expert witness with respect to Prepaids because he had no prior experience with Prepaids and only possessed a general knowledge of securities.  We disagree.

The qualification of a witness as an expert is within the trial court's discretion, and this Court will not reverse that decision absent an abuse of discretion.  *Fields v. J. Haynes Waters Builders, Inc.*, 376 S.C. 545, 555, 658 S.E.2d 80, 85 (2008).  An abuse of discretion occurs when the decision of the trial court is unsupported by the evidence or controlled by an error of law.  *Ledford v. Pa. Life Ins. Co.*, 267 S.C. 671, 675, 230 S.E.2d 900, 902 (1976).  A trial court's ruling on the admissibility of an expert's testimony constitutes an abuse of discretion when the ruling is manifestly arbitrary, unreasonable, or unfair.  *Fields v. Reg'l Med. Ctr. Orangeburg*, 363 S.C. 19, 25–26, 609 S.E.2d 506, 509 (2005).  To warrant reversal based on the admission or exclusion of evidence, the appellant must prove both the error in the ruling and resulting prejudice.  *Id.*

Under Rule 702, SCRE, a witness can be qualified as an expert if the witness has "specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue."  In determining a witness's qualifications as an expert, the trial court should not have a solitary focus, but rather should make a broad inquiry.  *J. Haynes Waters Builders, Inc.*, 376 S.C. at 556, 658 S.E.2d at 86.  "The test for qualification of an expert is a relative one that is dependent on the particular witness's reference to the subject."  *Wilson v. Rivers*, 357 S.C. 447, 452, 593 S.E.2d 603, 605 (2004).

Maybank offered Freeman as an expert in the field of finance to testify as to the proper conduct for financial advisors, planning professionals, and trustees.  Prior to Appellants' objection, Freeman testified he had served as an investment advisor, a securities arbitrator, and a law school professor teaching on securities regulation, corporations, agency, and white collar crime.  On direct examination during voir dire, Freeman stated that in preparing to give his opinions about investment products, he had conducted his own research by reading articles on Prepaids, reviewing sales literature, and speaking to Maybank and McCann.

On cross-examination during voir dire, Freeman conceded his actual experience with Prepaids was limited in that he had never advised a client with respect to a Prepaid, nor had he taught any courses, designed a training program to educate investment advisors, written any training materials, or published any

articles or other materials on Prepaids. However, Freeman stated his lack of experience was consistent with his opinion that Prepaids were not viable long-term investments.

Given our deferential standard of review, we find there is evidence to support the trial court's decision to qualify Freeman as an expert witness. Freeman had experience with securities and alternative investments strategies, of which Prepaids are a type. *See Watson v. Ford Motor Co.*, 389 S.C. 434, 448, 699 S.E.2d 169, 176 (2010) (finding an expert unqualified when he admitted he had no knowledge, skill, experience, training, or education specifically related to cruise control systems). Accordingly, we affirm the trial court in qualifying Freeman as an expert.[11]

## III. JNOV MOTIONS[12]

When reviewing the trial court's ruling on a motion for a directed verdict or JNOV, this Court applies the same standard as the trial court by viewing the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *Elam v. S.C. Dep't of Transp.*, 361 S.C. 9, 27–28, 602 S.E.2d 772, 782 (2004). The trial court must deny a motion for a directed verdict or JNOV if the evidence yields more than one reasonable inference or its inference is in doubt. *Strange v. S.C. Dep't of Highways & Pub. Transp.*, 314 S.C. 427, 445 S.E.2d 439 (1994). Moreover, "[a] motion for JNOV may be granted only if no

---

[11] Moreover, we find Freeman's testimony did not prejudice Appellants. Appellants extensively cross-examined Freeman on his experience and qualifications. Additionally, Freeman's testimony was cumulative to that of McCann, who testified extensively concerning the unsuitability of Prepaids without objection from Appellants. Therefore, even if we were to hold that Freeman's testimony was admitted in error, reversal would not be warranted. *See Austin v. Stokes-Craven Holding Corp.*, 387 S.C. 22, 41, 691 S.E.2d 135, 145 (2010) (finding that even if the trial court erred in qualifying the expert witness, there was no prejudice because witness's testimony was cumulative to other testimony).

[12] In addition to the challenges discussed in detail below, Appellants argue the trial court erred in failing to grant their motion for JNOV on the claims for breach of fiduciary duty, breach of contract, negligent misrepresentation, constructive fraud, speculative damages, and the statute of limitations. Because we find ample evidence in the record supporting the jury's verdict on each of those claims, we affirm them pursuant to Rule 220, SCACR.

reasonable jury could have reached the challenged verdict." *Gastineau v. Murphy*, 331 S.C. 565, 568, 503 S.E.2d 712, 713 (1998). In deciding such motions, neither the trial court nor the appellate court has the authority to decide credibility issues or to resolve conflicts in the testimony or the evidence. *Welch v. Epstein*, 342 S.C. 279, 300, 536 S.E.2d 408, 419 (2000).

## A. UTPA

Appellants argue the trial court erred in failing to grant JNOV because Prepaids are exempt from the UTPA as a matter of law, and therefore, the trial court erred in submitting the question to the jury and in upholding the jury's finding of a UTPA violation. We disagree.

The UTPA declares "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . unlawful." S.C. Code Ann. § 39-5-20(a) (1985). "To recover in an action under the UTPA, the plaintiff must show: (1) the defendant engaged in an unfair or deceptive act in the conduct of trade or commerce; (2) the unfair or deceptive act affected public interest; and (3) the plaintiff suffered monetary or property loss as a result of the defendant's unfair or deceptive act(s)." *RFT Mgmt. Co. v. Tinsley & Adams L.L.P.*, 399 S.C. 322, 337, 732 S.E.2d 166, 174 (2012).

However, the UTPA provides an industry exemption for certain practices and transactions if the activity or transaction in question is subject to other regulation. *See* S.C. Code Ann. § 39-5-40 (1985) (explaining the UTPA expressly exempts certain practices and transactions by providing that it is inapplicable to "[a]ctions or transactions permitted under laws administered by any regulatory body or officer acting under statutory authority of this State or the United States"). The burden of proving an exemption is on the party claiming the exemption. *Id.*

Appellants moved for a directed verdict and JNOV, asserting that Prepaids fell under the UTPA's industry exemption. The trial court denied the motions, finding Appellants failed to carry their burden of proving the exemption applied. Specifically, the trial court noted it was undisputed that Appellants were not registered to sell securities as broker-dealers, thus explaining the SEC investigation into Appellants' fees that appeared to be "broker-esque." Moreover, the trial court found Appellants presented no evidence that Prepaids were a registered security or initial public offering that was regulated by another administrative body.

Appellants now assert the trial court erred in submitting the issue of whether Prepaids were subject to the UTPA to the jury because it is a question of law. We recognize section 35-1-102(29) of the South Carolina Code (Supp. 2014) provides that the definition of a security includes an "investment contract," and that courts in other jurisdictions have held as a matter of law that a Prepaid is a security.[13] Nevertheless, we find the trial court correctly submitted the issue to the jury based on the alternative theories of relief posited by Maybank and based on Appellants' position at trial that they were not subject to the Securities Act, and that they did not effectuate transactions and sell securities.

Appellants' own expert, Thorne, testified a Prepaid was not a security. He stated no sale occurred on the date the Prepaid was entered, and he believed the Prepaid was a contract. Furthermore, Fisher's testimony was that a Prepaid and the practice of advising on alternative investments created a gray area in the view of the SEC. Thus, through the testimony of their own witnesses, Appellants put forth evidence that was susceptible to more than one reasonable inference regarding the applicability of the exemption. Therefore, we find no error in the trial court's decision to submit this question to the jury.[14]

_____

[13] *See, e.g.*, *Chechele v. Sperling*, 758 F.3d 463, 471 (2d Cir. 2014) (explaining a Prepaid transaction was a sale of stock and qualified as the sale of an underlying security); *Anschutz Co. v. Comm'r*, 664 F.3d 313, 326 (10th Cir. 2011) (finding the entry into a Prepaid established a security interest).

[14] Maybank additionally challenges Appellants' argument on this issue based on waiver, issue preservation, and collateral estoppel. First, Maybank argues that because Appellants suggested the jury charge and consequently did not object to it, the issue is unpreserved. Normally, a party is required to object to the opposing party's suggested charge to preserve the matter for appeal. *Creech v. S.C. Wildlife & Marine Res. Dep't*, 328 S.C. 24, 36, 491 S.E.2d 571, 577 (1997). However, we find the facts here are easily distinguishable. Following the denial of their motion for directed verdict as to the UTPA claim, Appellants offered a charge on this issue. We decline to hold that this trial strategy, which amounts to Appellants simply playing the hand they were dealt, somehow precludes Appellants from arguing this issue on appeal. We also reject Maybank's arguments this issue is unpreserved or Appellants should be estopped from arguing they were involved in securities-related conduct because Appellants consistently argued they did not participate in the sale of the Prepaid. Appellants were placed in the position of defending numerous causes of action, some of which were arguably inconsistent with others. We therefore disagree a procedural bar precludes this Court from reaching the merits of whether the motion for JNOV should have been granted as

We also find sufficient evidence in the record to support the jury's finding of a UTPA violation. In responding to Appellants' post-trial motions, the trial court cited three specific instances in which the jury could have found Appellants liable for violating the UTPA: the WMA, the Approval Letter, and the Refund Letter. We agree with the trial court the WMA constitutes evidence upon which a jury could conclude Appellants violated the UTPA. *Cf. Elam*, 361 S.C. at 27–28, 602 S.E.2d at 782 (stating that in reviewing a trial court's ruling denying a motion for JNOV, appellate courts must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party, and may only reverse the trial court if there is no evidence to support its decision); *Curcio v. Caterpillar, Inc.*, 355 S.C. 316, 320, 585 S.E.2d 272, 274 (2003) ("In considering a JNOV, the trial judge is concerned with the existence of evidence, not its weight."). For example, Walters testified Appellants knew the WMA presented to Maybank contained misrepresentations, and Appellants could not fulfill the three stated promises outlined in it. While Appellants put forth evidence the obligations of the WMA were fulfilled, testimony was introduced that Appellants knew for more than three years this document was incorrect to the extent it outlined the duties that would be performed as promised by Wealth Management. *Cf. Curcio*, 355 S.C. at 320, 585 S.E.2d at 274 ("When considering a JNOV, neither an appellate court, nor the trial court has authority to decide credibility issues or to resolve conflicts in the testimony or the evidence." (citation omitted) (internal quotation and alteration marks omitted)). Further, the policies and procedures of the Bank expressly prohibited Maybank's portfolio advisors from performing the very duties the Bank promised it would provide for him. Moreover, both Fisher and Walters admitted Appellants did not notify Maybank or any customer that the promises made through the WMA would not be fulfilled. As such, we affirm the trial court's finding that the WMA constitutes evidence upon which the jury could have found a UTPA violation.

We also agree with the trial court that the Approval Letter constitutes further evidence Appellants knowingly misrepresented their efforts and the extent of their review of Maybank's financial situation, which provides additional support for the jury's finding of a UTPA violation. On its face, the letter appeared to specifically address Maybank's needs, explicit goals, and financial concerns, which Maybank testified he discussed with Kapoor, Gibson, and Mahfood. However, the testimony established that in actuality, the Approval Letter was a fill-in-the blank form letter not tailored to any single client. Moreover, the record also includes evidence the

---

to the UTPA claim.

Approval Letter condoned a conflict of interest between Maybank's financial interest and Appellants. Accordingly, we affirm the trial court's finding that the Approval Letter is evidence upon which the jury could have found a UTPA violation.

Further, we find the Refund Letter is evidence of a deceptive practice that supports the jury's finding of a UTPA violation. Although the Refund Letter was sent by Appellants after the commencement of litigation, it concerned prior fees charged to Maybank and other clients that were subsequently questioned by the SEC. A reasonable jury could have found the Refund Letter supported Maybank's assertion of deception rather than being a reflection of ostensible corporate values.

As to the impact on the public interest,[15] we find the fact the Approval Letter as well as the Refund Letter were utilized by BB&T Corporation for multiple customers would allow a jury to conclude that these deceptive practices affected the public. We thus agree with the trial court that under the evidence adduced at trial, the question of whether Maybank's claim under the UTPA fell under the UTPA's industry exemption was for the jury. Moreover, we find sufficient evidence exists to uphold the jury verdict as to this cause of action. Accordingly, we find the trial court did not err in refusing to grant Appellants' motion for JNOV on this issue.

**B. Punitive Damages**

Appellants contend the trial court erred in denying their motion for JNOV on Maybank's claim for punitive damages because such damages are barred by the WMA's limitation on liability clause. We agree.

Paragraph F.1 of the WMA states, in pertinent part:

> F. <u>Limitation of Liability and Indemnification</u>. Client agrees:

---

[15] *See Daisy Outdoor Advert. Co. v. Abbott*, 322 S.C. 489, 493, 473 S.E.2d 47, 49 (1996) ("Since 1986, South Carolina courts have required that a plaintiff bringing a private cause of action under UTPA allege and prove the defendant's actions adversely affected the public interest.").

1. Bank and Investment Advisor shall not be liable with respect to their services under this Agreement except for any loss attributable to their negligence or willful misconduct. *In no event shall Bank or Investment Advisor be liable for any incidental, indirect, special, consequential or punitive damages*.

(Emphasis added).

Over Appellants' objection, the question of the enforceability of this clause was submitted to the jury, which awarded $5,000,000 in punitive damages to Maybank. In denying Appellants' motion for JNOV, the trial court held the clause was contrary to public policy and that its enforcement would be unconscionable. Further, the trial court held the clause unenforceable as to the common law causes of action of constructive fraud, breach of fiduciary duty, and negligent misrepresentation because these claims were not included within the scope of the services provided by the WMA. Specifically, the trial court found the parties did not contract for Appellants to make misrepresentations, and the jury found Appellants' actions were "intentional, reckless, and fraudulent."

When a contract is entered into freely and voluntarily, contractual limitations are normally enforced. *Ellis v. Taylor*, 316 S.C. 245, 248, 449 S.E.2d 487, 488 (1994). This Court has generally upheld limitations of liability and exculpatory clauses, finding they are commercially reasonable. *See, e.g.*, *Gladden v. Boykin*, 402 S.C. 140, 144–45, 739 S.E.2d 882, 884 (2013) (upholding a limitation of liability provision in a home inspection agreement which confined the liability of the inspection company to "a sum equal to the amount of the fee paid by the client for this inspection," and finding the clause neither unconscionable nor violative of public policy); *Huckaby v. Confederate Motor Speedway, Inc.*, 276 S.C. 629, 630, 281 S.E.2d 223, 224 (1981) (finding plaintiff's action against speedway for injuries sustained during a race was barred by a waiver and release voluntarily signed by plaintiff prior to entering the racetrack); *McCune v. Myrtle Beach Indoor Shooting Range, Inc.*, 364 S.C. 242, 248, 612 S.E.2d 462, 465 (Ct. App. 2005) (upholding a release which explicitly and unambiguously limited paintball range's liability for negligence); *S.C. Elec. & Gas Co. v. Combustion Eng'g, Inc.*, 283 S.C. 182, 192, 322 S.E.2d 453, 459 (Ct. App. 1984) (enforcing the language of an exculpatory clause in a contract for the sale of a boiler).

However, notwithstanding our general acceptance of limitation of liability provisions and exculpatory clauses, the law disfavors such provisions, and courts must strictly construe the language of the provision against the drafter. *Pride v. S. Bell Tel. & Tel. Co.*, 244 S.C. 615, 619, 138 S.E.2d 155, 157 (1964); *McCune*, 364 S.C. at 248, 612 S.E.2d at 465. Moreover, should a court find the provision violates public policy or is unconscionable, the court may declare the provision unenforceable. *Pride*, 244 S.C. at 621, 138 S.E.2d at 157. Nevertheless, a court's ultimate duty is confined to interpreting the contractual provisions agreed to by the parties—regardless of their wisdom or folly, apparent unreasonableness, or any failure of the parties to guard their interests carefully. *B.L.G. Enters., Inc. v. First Fin. Ins. Co.*, 334 S.C. 529, 535, 514 S.E.2d 327, 330 (1999).

In determining the public policy of this State, our courts must rely on legislative enactments whenever possible. *Gladden*, 402 S.C. at 143, 739 S.E.2d at 883. The trial court's sole basis for finding Paragraph F.1 violative of public policy was that the parties were not in an equal bargaining position. Maybank offers no additional legal basis upon which this Court could find the limitation on liability contrary to our public policy. We acknowledge our jurisprudence has stated a party should not be permitted to contractually insulate himself from liability where the parties are not on roughly equal bargaining terms. *Pride*, 244 S.C. at 619–20, 138 S.E.2d at 157. While recognizing the breadth of this pronouncement, we find it unpersuasive in this instance. It is true that a contract for services between an individual and a large corporation will frequently involve some disparity of bargaining power. However, this is not a case where an ordinary investor seeks financial services from a more knowledgeable company. Rather, Maybank has an extensive history as a trust advisor. Therefore, we cannot agree that the policy in this state is to decline enforcement of such a contract on this basis alone.

Somewhat similarly, a challenged contractual provision is examined to determine whether it is unconscionable due to both an absence of meaningful choice and oppressive, one-sided terms. *Simpson v. MSA of Myrtle Beach, Inc.*, 373 S.C. 14, 25, 644 S.E.2d 663, 669 (2007). The absence of meaningful choice on the part of one party is generally indicative of a fundamental unfairness of the bargaining process in the contract. *Id.* In analyzing the absence of meaningful choice, courts should consider, *inter alia*, the nature of the injuries, any disparity in the parties' bargaining power, the level of sophistication of the parties, whether there is an element of surprise in the challenged clause, and the conspicuousness of the clause. *Id.*

However, only in rare circumstances has an appellate court invalidated a contract on the basis of unconscionability.  For example, our courts have found that numerous one-sided provisions cumulatively impact the oppressive nature of an adhesion contract.  *See Simpson*, 373 S.C. at 36, 644 S.E.2d at 674.  Additionally, courts may consider whether the party asserting unconscionability spoke English, had the ability to consult an attorney, or faced other circumstances that made signing the contract in a particular instance grossly inequitable.  *See Holler*, 364 S.C. 256, 269–70, 612 S.E.2d 469, 476–77 (Ct. App. 2005) (declaring a prenuptial agreement unconscionable when a Ukrainian woman averred she was forced to sign the agreement because at the time, she was pregnant, did not speak English, and faced immediate deportation unless she married, but she lacked the funds or time to consult an attorney or translator).

Turning to Paragraph F.1, we find the clause is neither violative of public policy nor unconscionable.  Under its terms, it does not deprive Maybank of all damages arising under the contract but merely limits the type of damages he is entitled to recover.  Specifically, Maybank is precluded from seeking consequential damages, indirect damages, special damages, or punitive damages in claims arising from his relationships with Appellants; he is still entitled to actual damages.  While clauses limiting liability are to be strictly construed, we find no reason to ignore the plain language of the clause based on either public policy or unconscionability grounds.

Turning next to the scope of the exculpatory clause, the trial court held the clause only applied to "services under the [WMA]," and the common law causes of action did not arise in connection with the services set forth in the WMA.  Moreover, the trial court found the jury verdicts of constructive fraud, breach of fiduciary duty, and negligent misrepresentation preclude the enforcement of the clause because these claims arose from Appellants' "intentional, reckless, and fraudulent" conduct.

The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language.  *Schulmeyer v. State Farm Fire & Cas. Co.*, 353 S.C. 491, 495, 579 S.E.2d 132, 134 (2003).  When the contract's language is clear and unambiguous, the language alone determines its force and effect.  *Id.*  A contract must be read as a whole document such that litigants may not create an ambiguity by pointing to a single sentence or clause.  *Id.*

We find the WMA governs all aspects of the investment relationship between Maybank and Appellants, and the common law causes of action are subject to the limitations contained in Paragraph F.1. The trial court erred in relying solely on the services listed in the WMA and ignoring the language of the Addendum and Prepaids. Under general contract rules and plain language, these documents must be read as a whole because they all concerned one course of conduct: Appellants' investment advice. *See Reyhani v. Stone Creek Cove Condo. II Horizontal Prop. Regime*, 329 S.C. 206, 212, 494 S.E.2d 465, 468 (Ct. App. 1997) (explaining where multiple documents form the terms of a contract the documents will be interpreted so as to give effect to all of their provisions, if practical). Reading them thusly, we find the claims of constructive fraud, breach of fiduciary duty, and negligent misrepresentation are not outside the scope of the limitation of liability clause.

We also disagree with the trial court's finding that the jury verdicts of constructive fraud, breach of fiduciary duty, and negligent misrepresentation preclude the enforcement of the clause because these claims arose from Appellants' "intentional, reckless, and fraudulent" conduct. It is true that contracts may be avoided based on fraud. *Metro. Life Ins. Co. v. Stuckey*, 194 S.C. 469, 470, 10 S.E.2d 3, 5 (1940). We further recognize other jurisdictions have refused to enforce limitations on liability where actual fraud is involved.[16] Here, however, Maybank proceeded only on constructive fraud and dismissed his claim for actual fraud prior to trial. Constructive fraud is distinguishable from actual fraud in that constructive fraud does not require the element of intent to deceive. *See Ardis v. Cox*, 314 S.C. 512, 516, 431 S.E.2d 267, 270 (Ct. App. 1993) (noting that constructive fraud removes the element of intent found in actual fraud).

In general, we refuse to enforce contracts based on fraudulent conduct because a party should not retain the benefits of an agreement that he knowingly and *intentionally* entered into though deceptive means. *Regions Bank v.*

---

[16] *See, e.g., Roopchan v. ADT Sec. Sys., Inc.*, 781 F. Supp. 2d 636, 660 (E.D. Tenn. 2011) ("Courts will enforce exculpatory clauses unless there is 'fraud, misrepresentation or violations of the Tennessee Consumer Protection Act.'" (citation omitted)); *J.A. Jones Constr. Co. v. City of Dover*, 372 A.2d 540, 545 (Del. Super. Ct. 1977) ("Even if a contract purports to give a general exoneration from 'damages,' it will not protect a party from a claim involving its own fraud or bad faith."); *Houghland v. Sec. Alarms & Servs., Inc.*, 755 S.W.2d 769, 773 (Tenn. 1988) (holding exculpatory "clauses do not ordinarily protect against liability for fraud or intentional misrepresentation").

*Schmauch*, 354 S.C. 648, 672, 582 S.E.2d 432, 444 (Ct. App. 2003). Moreover, beyond the patent unfairness inherent in enforcing a contract induced through intentional fraud, giving legal effect to such a contract violates a fundamental principle of contract law: there must be a meeting of the minds. By its very nature, there can be no union of purpose where one party is intentionally deceiving the other through fraud. However, the jury's finding of constructive fraud is not equal to a finding of actual fraud and is thus not sufficient to thwart enforcement of the exculpatory clause.[17]

Accordingly, we find the trial court erred in failing to grant JNOV to Appellants on the award of punitive damages based on the limitation of liability clause found in the WMA. Thus, because Appellants are not subject to punitive damages, we need not address the Appellants' argument that Maybank must elect between the allegedly inconsistent portions of the jury's award. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (declining to address remaining issues when decision regarding a prior issue is dispositive).

## IV. TREBLING

Appellants contend the trial court erred in trebling damages because the WMA limits Maybank's recovery of statutory treble damages under the UTPA, and their alleged conduct did not constitute "willful or knowing" violations of the UTPA. Appellants further argue there is no evidence they knew or should have known their conduct violated the UTPA. We disagree.

The UTPA provides for treble damages upon a finding of a willful violation of the Act. *See* S.C. Code Ann. § 39-5-140(a) (Supp. 2014). A willful violation is defined by statute as occurring "when the party committing the violation knew or should have known that his conduct was a violation of [the UTPA]." S.C. Code Ann. § 39-5-140(d). Thus, if a person of ordinary prudence who was engaged in trade or commerce could have ascertained that his conduct violated the UTPA, such conduct is willful within the meaning of the statute. *Wright v. Craft*, 372 S.C. 1, 23–24, 640 S.E.2d 486, 498 (Ct. App. 2006).

---

[17] Similarly, we decline to hold that the clause is unenforceable based on of the jury's verdict for breach of fiduciary duty and negligent misrepresentation. As with constructive fraud, no specific intent to deceive is necessary to support either verdict.

We again note limitation of liability provisions and exculpatory clause are disfavored and will be strictly construed against the drafter. *Pride*, 244 S.C. at 619, 138 S.E.2d at 157. Here, the exculpatory clause prohibits "incidental, indirect, special, consequential or punitive damages," but does not specifically prohibit statutory or multiple damages. Appellants failed to explicitly limit statutory or multiple damages when they drafted the WMA, and we decline to extend its terms to prohibit the statutory treble damages awarded to Maybank under the UTPA. *Cf. Simpson*, 373 S.C. at 29–30, 644 S.E.2d at 671 (finding an arbitration agreement unconscionable when it purported to restrict a consumer from receiving the statutorily-mandated treble damages to which she might otherwise have been entitled in her underlying UPTA claim, because courts "will not enforce a contract which is violative of public policy, *statutory law*, or provisions of the Constitution" (emphasis added) (citation omitted)).

We find the evidence in the record supports the trial court's decision to treble damages. As previously discussed, the trial court found Appellants violated the UTPA based on the WMA, the Approval Letter, and the Refund Letter. We find this conclusion is clearly supported by the record. For example, numerous witnesses testified Appellants knew they could not fulfill the terms of the WMA. Further, the Refund Letter was portrayed to the jury as being disingenuous in its stated laudatory purpose, and the Approval Letter, though seemingly tailored specifically to Maybank, was a mere fill-in-the-blank form letter. Therefore, we find evidence exists to uphold the trial court's decision to treble the damages under the UTPA.

## V. ATTORNEYS' FEES AND COSTS

Appellants argue the trial court erred in concluding eighty percent of the attorneys' fees and costs were attributable to the UTPA claim. Appellants challenge the award of fees and costs on multiple bases, including the sufficiency of documentation, reasonableness, the validity of the enhancement of the award through the lodestar multiplier, and the use of witness fees and deposition expenses. We disagree.

The decision to award or deny attorneys' fees and costs will not be disturbed on appeal absent an abuse of discretion. *S.C. Dep't of Transp. v. Revels*, 411 S.C. 1, 8, 766 S.E.2d 700, 703 (2014). "An abuse of discretion occurs when the conclusions of the trial court are either controlled by an error of law or are based on unsupported factual conclusions." *Kiriakides v. Sch. Dist. of Greenville Cty.*, 382 S.C. 8, 20, 675 S.E.2d 439, 445 (2009) (citation omitted).

Generally, attorneys' fees and costs are not recoverable unless authorized by contract or statute. *Blumberg v. Nealco, Inc.*, 310 S.C. 492, 493, 427 S.E.2d 659, 660 (1993). The UTPA permits a successful plaintiff to recover reasonable attorneys' fees and costs. S.C. Code Ann. § 39-5-140(a) ("Upon the finding by the court of a violation of this article, the court shall award to the person bringing such action under this section reasonable attorney's fees and costs.").

Appellants argue the affidavit of attorneys' fees and costs submitted by Maybank's counsel was inadequate and lacked the necessary detail that would enable Appellants to respond. They suggest Maybank failed to provide detailed billing statements to identify how the billed hours correlated to the claims alleged, especially since Maybank prevailed on only five of his eleven claims, and the Trust lost on all its claims. Moreover, Appellants suggest the insufficiency in the billing statements make it difficult to ascertain and delineate the work completed in furtherance of the UTPA claim—which is the only claim upon which attorneys' fees and costs may be awarded.

We find all of Maybank's claims shared the same common facts and required combined efforts throughout the litigation process. The trial court's reduction of fees by twenty percent accounts for a distinction in the claims and the time allotted to defend claims unrelated to the UTPA. We find this to be a reasonable estimation. *Cf. Haley Nursery Co. v. Forrest*, 298 S.C. 520, 524, 381 S.E.2d 906, 909 (1989) (finding a reduction in fees and costs reflected that the fees and costs sought were not solely from the UTPA action).

We turn next to the calculation of determining reasonable attorneys' fees under the UTPA and the trial court's application of the lodestar multiplier. "A lodestar figure is designed to reflect the reasonable time and effort involved in litigating a case, and is calculated by multiplying a reasonable hourly rate by the reasonable time expended." *Layman v. State*, 376 S.C. 434, 457, 658 S.E.2d 320, 332 (2008). Moreover, in some cases of exceptional success an enhanced award may be justified by using a lodestar multiplier. *Id*. In determining the reasonable time and hourly rate for attorneys' fees, the Court looks to the factors set forth in *Jackson v. Speed*, which include the nature, extent, and difficulty of the case; the time necessarily devoted to the case; the professional standing of counsel; the contingency of compensation; the beneficial results obtained; and the customary legal fees for similar services. 326 S.C. 289, 308, 486 S.E.2d 750, 760 (1997).

Here, the trial court's order awarding $2,654,295 in attorneys' fees based on the lodestar multiplier is detailed and contains a thorough discussion of the *Jackson* factors used to determine reasonable attorneys' fees. This matter was heavily litigated for several years, involved thirty-two depositions, and produced more than 60,000 pages of documentation. Moreover, there were numerous motions filed by Appellants, including ten separate motions for summary judgment and seven motions *in limine*. This case took a tremendous amount of time and effort by experienced counsel, which garnered beneficial results for Maybank on five causes of action. We find the trial court's finding of the base attorney fee award of $1,769,530 was proper, along with applying the 1.5 multiplier to reach $2,654,295. Moreover, we agree with the trial court that Maybank achieved a successful result in this very complex case. Finally, the excellent business court judge who tried this case was involved in this matter from the time the federal court remanded the case through the post-trial motions, a period of twenty-one months. Thus, we find the judge acted within his discretion in awarding attorneys' fees and applying the lodestar multiplier.

The trial court also awarded $245,011 in costs to Maybank. Appellants claim error in allowing Maybank to be awarded costs not specifically statutorily authorized, such as expert witness fees and unnecessary deposition expenses. Appellants contend a party "must be able to point to some statute which allows him [to recover specific costs]," which Maybank is unable to do. *See Oliver v. S.C. Dep't of Highways & Pub. Transp.*, 309 S.C. 313, 318, 422 S.E.2d 128, 131 (1992). There, the plaintiff sought recovery of costs pursuant to section 15-37-40 of the South Carolina Code (2005), a general statute relating to the clerk of court entering judgment. *Id*. at 319, 422 S.E.2d at 132. The statute at issue expressly provided for a limited list of recoverable fees, but not costs. *Id.*

However, this case is distinguishable from *Oliver* because the UTPA expressly allows for "reasonable costs" arising from litigation. S.C. Code Ann. § 39-5-140. The term "reasonable costs" is undefined. Nonetheless, this Court has previously upheld the award of costs for expert witness fees based on reasonableness. *See Lewis v. Lewis*, 392 S.C. 381, 394, 709 S.E.2d 650, 656–57 (2011) (upholding the family court's award of expert witness fees in the amount of $23,066.25); *Peirson v. Calhoun*, 308 S.C. 246, 255, 417 S.E.2d 604, 609 (Ct. App. 1992) (finding the trial court had authority under Rule 26(b)(4)(C) to order the deposing party to pay a reasonable expert witness fee). We therefore believe costs arising from UTPA litigation should be treated in the same manner, and may include expert witness fees. *See Hale v. Basin Motor Co.*, 795 P.2d 1006, 1013 (N.M. 1990) (holding costs in unfair trade practice litigation should not be treated

any differently from other litigation); *see also Trimper v. City of Norfolk*, 58 F.3d 68, 75 (4th Cir. 1995) (explaining litigation costs include litigation expenses such as secretarial costs, copying, telephone costs, and necessary travel).  Based on the standard of review and the evidence in the record, it was well within the trial court's discretion to grant Maybank costs.  Accordingly, we affirm the trial court's award of attorneys' fees and costs.

## VI.    PREJUDGMENT INTEREST

Turning now to the cross-appeal, Maybank contends the trial court erred in failing to award him statutory prejudgment interest on the jury's actual damages. We disagree and affirm pursuant to Rule 220(b)(1), SCACR, and the following authorities: S.C. Code Ann. § 34-31-20(A) (Supp. 2014) ("In all cases of accounts stated and in all cases wherein any sum or sums of money shall be ascertained and, being due, shall draw interest according to law, the legal interest shall be at the rate of eight and three-fourths percent per annum."); *Historic Charleston Holdings, L.L.C. v. Mallon*, 381 S.C. 417, 435–36, 673 S.E.2d 448, 457–58 (2009) ("The trial court's decision whether to award prejudgment interest will not be disturbed on appeal absent an abuse of discretion."); *Butler Contracting, Inc. v. Court St., L.L.C.*, 369 S.C. 121, 133, 631 S.E.2d 252, 259 (2006) ("The proper test for determining whether prejudgment interest may be awarded is whether the measure of recovery, not necessarily the amount of damages, is fixed by conditions existing at the time the claim arose.").

## CONCLUSION

As set forth above, we reverse the award of punitive damages based on the limitation of liability clause.  As a result, we decline to address the election of remedies issue, and affirm on all other grounds.

**Acting Justices James E. Lockemy, Jasper M. Cureton, Clifton Newman and William H. Seals, Jr., concur.**