HILL, J.:
**565 A jury awarded Brian Morin damages on his breach of contract and Wage Payment Act claims against Innegrity, LLC. Pursuant to section 41-10-80(C) of the South Carolina Code (Supp. 2017), the trial court trebled the Wage Payment Act damages, and awarded Morin prejudgment interest, costs, and attorney's fees. Innegrity appeals, arguing the trial court erred by (1) denying its judgment notwithstanding the verdict (JNOV) motion as to Morin's breach of contract claim because it had proven the defense of impossibility, and some of the damages were speculative; (2) denying its JNOV motion on Morin's Wage Payment Act claim because the damages were unsupported by the evidence, and Innegrity established the defense of equitable estoppel; (3) trebling the Wage Payment Act award; (4) excluding Morin's deposition testimony from evidence; and (5) denying its motion for a new trial based on after-discovered *135 evidence. We affirm all of the trial court's rulings except the trebling of part of Morin's Wage Payment Act damages.
I.
Working out of his home, Brian Morin developed a patented process for manufacturing a lightweight, high-strength synthetic fiber. In 2004, he founded Innegrity, LLC to bring the product to market. He financed Innegrity's early growth with his own funds and investments from family and friends. In 2008, Dr. Robert Schwartz invested three million dollars in Innegrity. In exchange, Morin transferred ownership of the intellectual property to the company and signed an Employment Agreement (Agreement) governing his rights and responsibilities as President and CEO. The Agreement included the company's promise to remove Morin as guarantor on any of Innegrity's loans if he were fired "without cause."
Despite the influx of funds, the company suffered from the severe recession that began in 2008. As money woes persisted, Innegrity's Board instructed Morin to "stretch" the company's cash. To avoid layoffs, in April 2009 Morin and other key **566 employees signed letters agreeing to reduce their salaries by certain percentages, which they would recoup as a bonus once the company raised another one million dollars. Upon reaching the goal in September 2010, Morin and the others signed a second agreement delaying the bonus payout until collection of another two million dollars.
The lingering recession, chronic undercapitalization, and Board turnover increased pressure on Innegrity. To finance equipment Morin valued at 2.5 million dollars, in 2008, Innegrity borrowed 1.4 million dollars from BB&T in exchange for a first lien on equipment and a personal guarantee by Morin. Morin also guaranteed a loan to Innegrity from Appalachian Development Company (ADC) and engaged the investment firm McGladrey Capital to search for other funding. In addition, Morin was instrumental in securing substantial grants from the National Science Foundation (NSF) and South Carolina Launch.
In 2009, an ex-Innegrity employee approached a Board member and accused Morin of falsifying time records related to the NSF grant. The Board members, including Morin, voted to hire outside counsel to investigate the allegation and later self-reported to the NSF, which suspended and ultimately terminated the grant.
Around 2010, several companies became interested in purchasing Innegrity. After conducting due diligence, however, the companies withdrew. As Innegrity's cash began evaporating, its Board members began resigning, and those left were less than cohesive. At an early November 2010 Board meeting, a motion to terminate Morin for cause failed. A few days later, the Board terminated Morin without cause. At the time, he owned approximately 23 percent of the company. Innegrity defaulted on the BB&T and ADC loans, and never removed Morin as guarantor. BB&T later auctioned the equipment for $700,000, and sued Morin on his guaranty.
After Innegrity refused to pay his severance, back pay, and other monies, Morin brought this lawsuit. At the jury trial, he sought damages for Innegrity's alleged breach of contract and violation of the Wage Payment Act. Innegrity counterclaimed for breach of fiduciary duty, breach of duty of loyalty, and equitable estoppel. The jury awarded Morin $308,456 for **567 breach of contract (including $150,000 for the BB&T loan) and $73,230 on his Wage Payment Act claim. After a post-trial hearing, the trial court trebled the Wage Payment Act damages and awarded prejudgment interest, attorney's fees, and costs.
II.
Innegrity challenges the denial of its JNOV motion on Morin's claim for breach of the contract provision requiring Innegrity to remove Morin as guarantor on the BB&T and ADC loans, contending performance was impossible.
We review a JNOV ruling in an action at law using the same yardstick as the trial court: presuming credibility of the evidence, we measure it in the light most favorable to *136 Morin and gauge whether there is enough evidence as to each element of the claim to allow a rational jury to find in Morin's favor. If there is, the motion must be denied, for when reviewing a JNOV ruling, neither trial nor appellate courts may second-guess jury verdicts supported by reasonable evidence. S.C. Const. art. V, § 5 ; Welch v. Epstein , 342 S.C. 279, 300, 536 S.E.2d 408, 419 (2000).
Innegrity asserts it conclusively established its affirmative defense of impossibility of performance at trial by showing the company was insolvent at the time of Morin's termination, and BB&T and ADC had rejected their request to remove Morin from his guarantees.
The doctrine of impossibility excuses performance when "the thing to be done cannot by any means be accomplished, for if it is only improbable or out of the power of the obligor, it is not deemed in law impossible." Hawkins v. Greenwood Dev. Corp. , 328 S.C. 585, 593, 493 S.E.2d 875, 879 (Ct. App. 1997) (citation omitted). Innegrity bore the burden of proving impossibility by the greater weight of the evidence. Id.
Early cases were uniform that once a party contracted to perform an act, their later failure to perform the act promised breached the contract, unless it expressly excused performance or allocated the risk of nonperformance elsewhere. This rule is traced to Paradine v. Jane , 62 Eng. Rep. 897 (K.B.
**568 1647), and its limited exceptions, as developed in the United States, were described in Dermott v. Jones , 69 U.S. 1, 5-6, 2 Wall. 1, 17 L.Ed. 762 (1864) :
[I]f a party by his contract charge himself with an obligation possible to be performed, he must make it good, unless its performance is rendered impossible by the act of God, the law, or the other party. Unforeseen difficulties, however great, will not excuse him. ... If unexpected impediments lie in the way, and a loss must ensue, it leaves the loss where the contract places it. If the parties have made no provision for a dispensation, the rule of law gives none. It does not allow a contract fairly made to be annulled, and it does not permit to be interpolated what the parties themselves have not stipulated.
To account for this strict liability, parties began building excuses into their contracts, but these attempted safeguards proved as imperfect as human foresight. Over time, courts elsewhere began using the doctrine of impossibility of performance to fill gaps left when parties failed to foresee and allocate catastrophic risks. But as the Seventh Circuit notes, parties can still eschew these safeguards and agree to perform acts over which they have no control:
[The doctrine of impossibility of performance] is just a gap filler-a guess at what the parties would have provided in their contract had they thought about the contingency that has arisen and has prevented performance or made it much more costly. As Holmes explained, "the consequences of a binding promise at common law are not affected by the degree of power which the promisor possesses over the promised event. ... In the case of a binding promise that it shall rain to-morrow, the immediate legal effect of what the promisor does is, that he takes the risk of the event, within certain defined limits, as between himself and the promisee. He does no more when he promises to deliver a bale of cotton." O.W. Holmes, Jr., The Common Law 299-300 (1881).
Wisconsin Elec. Power Co. v. Union Pac. R. Co. , 557 F.3d 504, 506 (7th Cir. 2009) (internal citations omitted).
A leading South Carolina impossibility case involved a promise to deliver not cotton, but blackeyed peas. Not just any **569 blackeyed peas, but "Texas New Crop U.S. 1 Blackeye peas" grown in Dilley, Texas. Our supreme court held performance of the contract was made impossible due to an act of God when torrential rains wiped out the entire Dilley crop. Citing Dermott , the court held performance is excused when "rendered impossible by the act of God, the law, or the other party." Pearce-Young-Angel Co. v. Charles R. Allen, Inc. , 213 S.C. 578, 586, 50 S.E.2d 698, 701 (1948) ; see also Ordinary of Charlestown Dist. v. Corbett & Lightwood , 1 S.C.L. 328, 323 (1793) (finding performance was made impossible by British invasion during American Revolution, reaffirming "the act of God, *137 or of an enemy, were the highest excuses known in law for the non-performance of a contract") (Rutledge, C.J.).
Later South Carolina cases have reaffirmed, but not expanded, these limited grounds of impossibility. See, e.g., Jones v. Bates , 241 S.C. 189, 193, 127 S.E.2d 618, 619 (1962) ; V.E. Amick & Assocs., LLC v. Palmetto Envtl. Grp., Inc ., 394 S.C. 538, 546, 716 S.E.2d 295, 299 (Ct. App. 2011).
Some jurisdictions have modernized the doctrine of impossibility (also known as impractibility or frustration), repurposing it as a tool of equity to fill gaps or imply conditions in contracts when strict performance would be abjectly unfair or unreasonable. See, e.g., Opera Co. of Boston v. Wolf Trap Found. for Performing Arts , 817 F.2d 1094, 1100 (4th Cir. 1987) ("[W]e accept as the correct statement of the modern and prevailing doctrine of impossibility of performance as a defense to a breach of contract to be essentially as equitable in character 'based [to quote Williston] on the unfairness or unreasonableness of giving [the contract] the absolute force which its words clearly state' ....") (alterations in original) (quoting 18 Williston on Contracts § 1937 at 33 (Jaeger ed., 3d ed. 1978) ) (Russell, J.) (applying Virginia law); Transatlantic Fin. Corp. v. United States , 363 F.2d 312, 315 (D.C. Cir. 1966) ("The doctrine [of impossibility] ultimately represents the ever-shifting line, drawn by courts hopefully responsive to commercial practices and mores, at which the community's interest in having contracts enforced according to their terms is outweighed by the commercial senselessness of requiring performance."). See also Restatement (Second) of Contracts § 261 (Am. Law. Inst. 1981) ; 2 E. Allan Farnsworth, Farnsworth on Contracts , §§ 9.5-9.7 (3d ed. 2004).
**570 South Carolina's only nod to the modern trend appears in our commercial code, which in the limited context of sales of goods excuses compliance with contract terms "if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made." S.C. Code Ann. § 36-2-615(a) (2003).
We find Innegrity's impossibility defense fails as a matter of law, as Innegrity bore the risk of not being able to remove Morin from the guarantees. Innegrity's claimed financial inability to perform cannot constitute impossibility, for consistent with Dermott , "the fact that one is unable to perform a contract because of his inability to obtain money, whether due to his poverty, a financial panic, or failure of a third party on whom he relies for furnishing the money, will not ordinarily excuse nonperformance in the absence of a contract provision in that regard." Moon v. Jordan , 301 S.C. 161, 164, 390 S.E.2d 488, 490 (Ct. App. 1990) ; see also 407 E. 61st Garage, Inc. v. Savoy Fifth Ave. Corp ., 23 N.Y.2d 275, 296 N.Y.S.2d 338, 244 N.E.2d 37, 41 (1968) ("[W]here impossibility or difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused."). Accord 30 Williston on Contracts § 77:46 (4th ed. 1990). The Restatement is no more forgiving. Restatement (Second) of Contracts § 261 (Am. Law Inst. 1981) cmt. b ("[M]ere market shifts or financial inability do not usually effect discharge under the rule stated in this Section.").
Equally unavailing is Innegrity's claim it was "impossible" to force the lenders to remove Morin's obligations. Innegrity assumed the risk it would be able to relieve Morin of the guarantees, whether by making alternative arrangements with the lender or paying off the loan. Even the most generous interpretation of impossibility will not save a contracting party who bargains for his own folly by guaranteeing performance despite impracticability. This is the lesson of Holmes' rainmaker. See supra Farnsworth, Farnsworth on Contracts , § 9.6 at 643. See also Restatement (Second) of Contracts § 261 (1981), cmt. c.
**571 Also, the Agreement provided that if Innegrity terminated Morin for cause, Innegrity was obligated only to exert its "best efforts" to relieve Morin from the guarantees, a stark acknowledgment of the absolute duty and heightened risk it would take on by choosing to terminate him absent cause. See *138 McPherson v. J.E. Sirrine & Co. , 206 S.C. 183, 207, 33 S.E.2d 501, 510 (1945) ("Parties ... bind themselves by their lawful contracts, and [c]ourts cannot alter them because they work a hardship." (citation omitted) ). See also Duke Power Co. v. S.C. Pub. Serv. Comm'n , 284 S.C. 81, 89, 326 S.E.2d 395, 400 (1985) ("[A] party to a contract should not be given relief from the requirements of the contract simply because it proved to be less favorable than an alternative provision would have been.").
Finally, even if Innegrity's impossibility defense was a jury question, plenty of evidence supports the jury's decision it was possible for Innegrity to perform. Morin testified the intellectual property of the company was worth ten million dollars. There was evidence the BB&T loan transaction included an option whereby Innegrity could have forced a German company to repurchase the equipment for roughly twice the amount BB&T eventually obtained at auction. Deciding the credibility of this evidence was up to the jury; all that is up to us is deciding whether there was any evidence supporting the jury's verdict, which we find there was. See Welch , 342 S.C. at 300, 536 S.E.2d at 418 (jury verdict will be upheld if any evidence sustains the factual findings implicit in its decision).
III.
Innegrity also attacks the jury's award of $150,000 in damages on the BB&T guaranty as speculative. We see no merit to this point. Morin testified BB&T had sued him on the full amount of the guaranty, which exceeded $250,000, but had offered to settle for $150,000. This proved Morin's damages to a reasonable certainty; the law requires nothing more. Haltiwanger v. Barr , 258 S.C. 27, 32-33, 186 S.E.2d 819, 821 (1972) (future damages need not be proven to a mathematical certainty, and often must be approximated; therefore, "[a] wide latitude is allowed the jury"); Lockhart Power Co. v. Askew , 110 S.C. 449, 454, 96 S.E. 685, 687 (1918) (damages reasonably certain to materialize in future should be included in award of **572 compensatory damages, for otherwise the injured party "would be remediless").
IV.
Innegrity asserts the trial court should have granted its JNOV motion on its defense of equitable estoppel. The essence of this defense was Morin misled the Board about Innegrity's financial condition, failed to follow the Board's directions to set aside monies sufficient to fund two months of payroll, caused the company to fail to pay wages by orchestrating the bonus deals, and caused the loss of the NSF funding. Innegrity claims it learned of the outstanding wages only upon Morin's departure, when it also found itself penniless.
As we understand Innegrity's argument, this evidence (which Innegrity interchangeably refers to also as breach of fiduciary duty and disloyalty) was sufficient to estop Morin from recovering on his Wage Payment Act claim. To establish equitable estoppel, Innegrity had to prove Morin knowingly misled it by falsely representing or concealing material facts-facts that were not known or capable of being known by Innegrity-and that it relied on Morin's conduct by prejudicially changing its position. Boyd v. Bellsouth Tel. Tel. Co. , 369 S.C. 410, 422, 633 S.E.2d 136, 142 (2006) ; see also Rodarte v. Univ. of S.C. , 419 S.C. 592, 601, 799 S.E.2d 912, 916 (2017).
The record demonstrates Innegrity's Board knew or should have known about the payroll liabilities. Morin presented the Board a September 2010 unaudited financial statement from the Elliott Davis accounting firm. Morin testified the amount of Innegrity's liability for the deferred wages was included on the statement under the accrued liabilities category. The statement also showed Innegrity had a "member's deficit" exceeding 2.7 million dollars. The Board's September 23, 2010 Executive Committee Meeting Minutes refer to discussion of "the previously enacted salary reductions that dated back to 2009," corroborating Morin's testimony the Board knew of the bonus arrangements. This was enough to enable the jury to conclude Innegrity was not ignorant of the company's wage obligations and other dire financial straits. See Welch , 342 S.C. at 300, 536 S.E.2d at 418 ("This [c]ourt will reverse the trial **573 court only when there is no evidence to support the ruling below."). We also find *139 there was no evidence Innegrity prejudicially changed its position in reliance on Morin's conduct.
V.
Next, Innegrity argues it is entitled to JNOV on the jury's award of $47,888 in back pay to Morin on his Wage Payment Act claim covering the wages withheld during the April 2009-June 2010 bonus arrangement. Innegrity contends this amount is inconsistent with the twenty-five percent reduction of Morin's $140,000 annual salary. We find the jury was entitled to credit Morin's testimony the amount owed was that stated in the September 2010 letter, a figure very close to the verdict amount. We have no way of knowing the jury's thought process, but we do know the amount it awarded was within the range of evidence.
Innegrity contends it was reasonable to withhold Morin's wages because his alleged disloyalty and misconduct left the company insolvent. It was undisputed Innegrity fired Morin without cause. The Board resolution memorializing his firing listed no disloyalty or other bad acts. There was extensive evidence demonstrating Morin's competency and loyalty. We need not wade into these weeds though, for the Agreement provides that even if Morin was fired "for cause," he was entitled to back pay.
Innegrity also points to language in the April 2009 bonus letter stating the company was not obligated to pay up if the employee was terminated. But the jury had the right to believe Morin's testimony that the company's typical policy and course of conduct was to pay the bonus even when employees had left. More to the point, the second bonus letter contained no such condition. It was also the jury's prerogative to conclude the bonus arrangement (including its conditioning of payment on achievement of the $2 million goal) did not modify Innegrity's obligation to pay Morin's wages pursuant to the Agreement.
VI.
Innegrity next challenges the trial court's trebling of the Wage Payment Act damages. Section 41-10-80(C) grants **574 the trial court the discretion to award treble damages if it finds there was no bona fide dispute the wages were owed and the withholding was unreasonable and done in bad faith. Rice v. Multimedia, Inc. , 318 S.C. 95, 98-99, 456 S.E.2d 381, 383 (1995). In reviewing the award, we may find our own facts. Ross v. Ligand Pharm., Inc. , 371 S.C. 464, 471, 639 S.E.2d 460, 464 (Ct. App. 2006).
The trial court found the jury's verdict proved there was no reasonable or good faith dispute. But a "finding that an employee is entitled to recover unpaid wages is not equivalent to a finding that there existed no bona fide dispute as to the employee's entitlement to those wages." Temple v. Tec-Fab, Inc. , 381 S.C. 597, 600, 675 S.E.2d 414, 415 (2009).
Innegrity argues Morin was not entitled to back pay because he agreed he would be paid the bonus only when the company obtained two million dollars in funding, a condition that never occurred. While the jury rejected Innegrity's rationale, we must determine whether it constituted a "valid close question of law or fact," Rice , 318 S.C. at 99, 456 S.E.2d at 383 (citation omitted), sufficient to create a bona fide dispute over the withholding. Perhaps, as Morin suggests, the jury concluded the bonus letter did not override his Agreement. But we are concerned only with whether Innegrity's view of the enforceability of the bonus letter was reasonable enough to form a good faith basis for withholding Morin's wages.
We hold that it was, and therefore reverse the trial court's trebling of the $47,888 portion of the back pay verdict. See Goodwyn v. Shadowstone Media, Inc. , 408 S.C. 93, 99-100, 757 S.E.2d 560, 563-64 (Ct. App. 2014) (hiring letter indicating employee would receive commissions only upon collection created bona fide dispute as to when wages due).
The jury's back pay award, however, was not limited to the bonus. It also included $11,030 in vacation back pay and Morin's salary for October and November 2010, categories unaffected by the bonus arrangement. The trial court correctly trebled these amounts, as Innegrity gave no good faith reason for withholding them.
*140 **575 VII.
In 2013, a federal grand jury indicted Morin for crimes related to his handling of the NSF grant. The indictment alleged Morin knowingly made false claims to the government, made false statements in a grant report, and willfully stole, embezzled, and converted one thousand dollars of NSF funds. A few days later, Morin was deposed by Innegrity in this case, during which he invoked the Fifth Amendment to several questions concerning the NSF matter.
Before trial, Innegrity advised the trial court it intended to offer the deposition excerpts in evidence pursuant to Rule 32, SCRCP, and would request the jury be charged that it could draw an adverse inference against Morin based on his invocations. See Baxter v. Palmigiano , 425 U.S. 308, 318-20, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) ; Griffith v. Griffith , 332 S.C. 630, 640-41, 506 S.E.2d 526, 531-32 (Ct. App. 1998). Believing Innegrity's proposal premature, the trial court ruled in limine Innegrity would only be entitled to admit the deposition excerpts and receive the adverse inference charge if Morin claimed the Fifth Amendment before the jury.
Morin was on the stand for over three hours the first day of trial. During cross-examination, Morin admitted an ex-employee had approached a Board member "and said that he hadn't worked on a grant that he was supposed to be working on and that I had reported to the government more time than he actually spent on this grant."
When Innegrity attempted to put Morin's deposition in evidence during its case, the trial court sustained Morin's objection, relying on Rule 403, SCRE. The trial court explained Innegrity could ask Morin the same questions it posed in the deposition, but until it did so, the deposition evidence was excludable as unduly prejudicial.
Innegrity claims the trial court's ruling hampered its trial strategy and ran afoul of Rule 32, SCRCP, which it interprets as granting a party the absolute right to admit the deposition of an adverse party for "any purpose." By forcing Innegrity to ask Morin the same questions he had previously taken the Fifth Amendment on, Innegrity claims it was placed **576 in the untenable position of cross-examining a witness whose answers might differ from his deposition responses.
Evidentiary rulings may only be overturned for an abuse of discretion that prejudices a party. Abuse of discretion occurs when the ruling rests on a legal error or inadequate factual support. Prejudice ensues when it is likely the challenged evidence or its omission influenced the verdict. Fields v. Reg'l Med. Ctr. Orangeburg , 363 S.C. 19, 26, 609 S.E.2d 506, 509 (2005).
Like its federal counterpart, Rule 32, SCRCP"permits a party to introduce, as part of his substantive proof, the deposition of his adversary, and it is quite immaterial that the adversary is available to testify at the trial or has testified there." Cmty. Counselling Serv., Inc. v. Reilly , 317 F.2d 239, 243 (4th Cir. 1963) (Haynsworth, J.) (footnote omitted); see also 8A Wright & Miller Fed. Prac. & Proc. Civ. § 2145 (3d ed.). But the admissibility of any evidence is subject to the South Carolina Rules of Evidence, Rule 43(a), SCRCP, ("All evidence shall be admitted which is admissible under the statutes or rules of evidence heretofore applied in the courts of this State."), including Rule 611, SCRE, which gives the trial court vast discretion to control the mode and order of testimony, and Rule 403, SCRE. The main use of Rule 403 is to allow the presiding judge to ensure fairness of the trial by "excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." United States v. McRae , 593 F.2d 700, 707 (5th Cir. 1979).
The trial court's nuanced ruling did not forbid Innegrity from admitting Morin's deposition or impeaching him with it. It conditioned admission on Morin's refusal to answer those same questions before the jury. The pivotal question was whether Morin had participated in falsifying NSF grant time records. Despite the trial court's invitation, Innegrity never asked Morin this question at trial. Had they done so, the trial court's condition would have been met. Had Morin denied it, Innegrity could have impeached him with or otherwise admitted the deposition *141 and obtained the adverse inference charge. If Morin had admitted he falsified the records, the damage would have been equally done. See Coletti v. Cudd Pressure Control , 165 F.3d 767, 774 (10th Cir. 1999) (affirming similar **577 limitation on use of adverse party's deposition testimony, rejecting Coletti's claim that ruling "thwarted her entire case strategy.... If, as Ms. Coletti claims, the witnesses would have changed or fabricated their testimony at trial, plaintiff's counsel could easily have used their recorded deposition testimony to effectively impeach their responses. We see no reason to reverse the jury verdict merely because Ms. Coletti insists the trial court should have allowed her to utilize her own method of getting her point across, when another, at least equally effective method of getting that same point across was easily available.") (internal citation omitted).
What the trial court sought to avoid was Innegrity using the evidence as a dog whistle: putting in the isolated deposition excerpts and arguing Morin took the Fifth because he knew he had committed a crime, leaving the jury to infer Morin's character was suspect. This would unfairly prejudice Morin, mislead the jury and confuse the issues, the precise things Rule 403 is designed to prevent. It turns out Morin's NSF-related conduct was criminal, but that was not an issue for this civil jury. Innegrity acknowledged as much when it agreed it could not introduce evidence of his indictment. The probative value of the deposition excerpts was limited to their ability to generate the adverse inference instruction, which might have marginally advanced Innegrity's theory of Morin's disloyalty. This value was dwarfed by the risk that injecting Morin's claim to the right against self-incrimination without sufficient context would sidetrack the jury, jostling their focus from the relevant. Heidt, The Conjurer's Circle-the Fifth Amendment Privilege in Civil Cases , 91 Yale L.J. 1062, 1124 (1982) (discussing use of Rule 403 to exclude a party's out-of-court invocation when it may "distract the jury from the main issues in the case by drawing their attention to the invoker's character and inviting speculation about the crimes he may have committed").
The trial judge can best survey the field of evidence and pinpoint the extent of this risk. Even if we were inclined to disagree with the trial court's call, which we are not, we would be hesitant to overturn it, and then only if we found the ruling outside the wide boundaries discretion sets. State v. Lyles , 379 S.C. 328, 339, 665 S.E.2d 201, 207 (Ct. App. 2008) ("If judicial self-restraint is ever desirable, it is when a Rule 403 analysis **578 of a trial court is reviewed by an appellate tribunal."). Nor can we find any prejudice to Innegrity, for the jury heard significant evidence the Board knew of Morin's role in the NSF scandal.
VIII.
We arrive at last to Innegrity's claim the trial court erred in denying its motion for a new trial based on Morin's November 2014 guilty plea in federal court to a misdemeanor related to his handling of the NSF grant.
Rule 60(b)(2), SCRCP, empowers a trial court to grant a new trial for newly discovered evidence if a party establishes the newly discovered evidence: "(1) will probably change the result if a new trial is granted; (2) has been discovered since the trial; (3) could not have been discovered before the trial; (4) is material to the issue; and (5) is not merely cumulative or impeaching." Lanier v. Lanier , 364 S.C. 211, 217, 612 S.E.2d 456, 459 (Ct. App. 2005) ; see also McCabe v. Sloan , 184 S.C. 158, 167-68, 191 S.E. 905, 908-09 (1937). Relief under the rule depends upon the post-trial discovery of previously unknown, outcome-changing facts the moving party could not have, with due diligence, unearthed before trial.
Applying this standard, the trial court found, and the record reflects, that the factual basis for Morin's guilty plea mirrored what Innegrity's Board already knew when they chose to terminate him without cause. The trial court noted Innegrity chose not to make the NSF issue a material part of its trial theory; Innegrity mentioned it during closing only to say the government was accusing Innegrity of defrauding it and had terminated the grant. The trial court found it unlikely evidence of Morin's conviction would have changed the verdict, and so do we.
The only new thing Morin's guilty plea revealed was that he had been convicted of a *142 misdemeanor. The jury was aware Innegrity knew of the allegations of Morin falsifying federal records, allegations credible enough to launch an internal investigation and cause NSF's Office of Inspector General to pay a visit and terminate the grant. All Morin's later guilty plea could add to this sideshow would be Innegrity stamping him with the stigma of a criminal conviction, which exposes **579 this evidence for what it is: pure impeachment, a category that can never carry the day on a Rule 60(b)(2) motion. We decline to disturb the considered conclusion of the trial judge, who had superior command over and an impartial view of the field of evidence.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
LOCKEMY, C.J., and HUFF J., concur.