**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
In The Court of Appeals

Buck Investments, LLC, Respondent,

v.

ROA, LLC; Deborah Rice-Marko; and PNC Bank, N.A., Successor to RBC Bank, Defendants,

Of whom ROA, LLC is the Appellant.

Appellate Case No. 2018-001729

———————

Appeal From Charleston County
D. Craig Brown, Circuit Court Judge

———————

Unpublished Opinion No. 2023-UP-249
Heard March 2, 2021 – Filed June 21, 2023

———————

**AFFIRMED**

———————

Louis H. Lang and Demetri K. Koutrakos, both of Callison Tighe & Robinson, LLC, of Columbia, for Appellant.

Morgan S. Templeton, of Wall Templeton & Haldrup, PA, of Charleston, and Thomas B Boger, of The Pflug Law Firm, LLC, of Mount Pleasant, both for Respondent.

———————

**MCDONALD, J.:** ROA, LLC (ROA) appeals the jury's award of $900,000 to Buck Investments, LLC (Buck) for breach of contract, arguing the circuit court erred by (1) granting Buck's motion for a directed verdict on ROA's impossibility defense and (2) denying ROA's motion for judgment notwithstanding the verdict (JNOV) as to its waiver and estoppel defenses. We affirm.

**Facts and Procedural History**

On March 20, 2013, ROA entered a real estate sales agreement (the Contract) to sell a King Street commercial property in Charleston (the Property) to Buck for $3.5 million. Deborah Rice-Marko was the sole owner and managing member of ROA; Edgar Alton Buck, Jr. (Edgar) was the managing member of Buck.

The Contract required Buck to pay $50,000 in earnest money and provided Buck "shall conduct an examination of title to the Property" during a specified inspection period. The Contract further stated, "If an exception to title not acceptable to Purchaser [Buck] appears on the Title Report or the new survey, Purchaser shall give Seller [ROA] notice of the exception within ten (10) business days after receipt . . . ." of the title reports and related documents. ROA would then have fifteen days to "remove any such exception, as long as Purchaser provide[d] written notice of such exception." The Contract included options addressing how the parties would proceed if an exception were stated.

The Contract required ROA "to remove at closing those exceptions which can be removed by paying an ascertainable sum of money such as mortgages" and noted "[t]he failure of either Party to exercise any power given any Party hereunder or to insist upon strict compliance by either Party of its obligations hereunder, shall not constitute a waiver of either Party's right to demand exact compliance with the terms hereof." The Contract anticipated closing to occur by April 3, 2013, and provided time was of the essence; however, the Contract gave ROA thirty calendar days to cure should it default "by failing to close for reasons within [ROA's] control."

On April 2—the day before the sale was to close—ROA communicated it would likely need an extension to obtain documents needed from tenants. On April 3, Rice-Marko did not appear for the closing. On April 4, the escrow attorney advised "Seller is in default and Purchaser reserves all rights as provided in the Agreement if Seller fails to cure the default within thirty (30) days." On April 5, Rice-Marko confirmed ROA needed the thirty-day extension. In forwarding the email chain in which Rice-Marko requested the extension, Edgar remarked to the

escrow attorney that there "must be a lender issue." Rice-Marko and Edgar exchanged several additional emails about closing the sale, and Rice-Marko continued to express her wish to sell the Property.

On May 3, 2013, PNC Bank (PNC) filed a foreclosure action as to certain properties ROA, Rice-Marko, her family members, and other entities owned. Prior to entering the Contract, Rice-Marko had experienced financial difficulties and executed a forbearance agreement and cross-collateralization of several properties through a 2012 restructuring. As of April 2013, the total amount PNC alleged it was owed exceeded $20 million. Pursuant to the terms of the restructuring, ROA was not permitted to transfer any rights in the Property without "[PNC's] prior written consent, which may be withheld in [PNC's] sole discretion." Neither Rice-Marko nor any other representative of ROA ever notified Buck of this issue prior to entering the Contract to sell the King Street property.

On May 14, the escrow attorney again wrote to advise that ROA was in default and Buck reserved "all rights" under the Contract arising from ROA's failure to cure the default. On July 10, Edgar again emailed Rice-Marko, stating he had not heard from her, noting he would still like to close on the Property, and inquiring as to whether she had spoken with her lender. Rice-Marko refused to further discuss the matter due to the pending litigation with PNC.

Buck filed suit against ROA and Rice-Marko, pleading causes of action for specific performance, breach of contract, negligent misrepresentation, fraudulent misrepresentation, constructive fraud, and breach of contract accompanied by a fraudulent act. In its amended answer, ROA raised defenses of waiver, estoppel, and impossibility of performance due to PNC's refusal to consent to the sale of the Property under the cross-collateralization agreement. ROA argued the Contract was "expressly conditioned on [ROA's] ability to release the lien held by PNC from the [P]roperty for an 'ascertainable sum of money.'" In 2017, Rice-Marko, her family members, ROA, and other entities settled the PNC case involving the foreclosure and cross-collateralization agreement.

Buck's case against ROA and Rice-Marko was tried in July 2018.[1] At the close of Buck's case in chief, ROA moved for a directed verdict on Buck's causes of action for specific performance and negligent misrepresentation, and as to punitive damages. ROA argued specific performance of the Contract was not

---

[1] In 2017, the circuit court granted PNC's motion for summary judgment as to Buck's specific performance claim and Buck's effort to compel PNC to consent to the sale of the Property.

"available . . .given the position of a third-party lienholder." ROA also moved for a directed verdict on Buck's breach of contract claim and moved to preclude Buck from arguing appreciation value or the loss of a 1031 exchange as appropriate measures of damages. The circuit court denied ROA's motions.

At the close of ROA's case, Buck moved for a directed verdict on ROA's defenses of impossibility, waiver, and estoppel, arguing *Morin v. Innegrity, LLC*[2] barred the defense of impossibility. ROA attempted to distinguish *Morin*, but the circuit court noted Rice-Marko presented "absolutely no testimony" that there "was not an ascertainable sum of money" PNC would accept to consent to the sale of the Property. The circuit court noted Rice-Marko's testimony that she was negotiating with PNC differed from evidence that there was no ascertainable sum PNC would take to release the Property for sale. ROA did not seek a directed verdict on impossibility, arguing there was sufficient evidence in the record for the jury to consider whether or not Buck waived or should be estopped as to any argument regarding PNC's mortgage and the requirement that PNC consent to the sale. ROA noted the mortgage was a matter of public record, Buck completed a title search, and Buck stated no exceptions as referenced in the Contract. "So, we believe that issue should go to the jury." ROA also renewed the "motions for a directed verdict that we argued after the close of [Buck's] case. The ones that were denied we would renew at this time just to preserve the record." Relying upon *Morin* and *Hawkins v. Greenwood Development Corp.*,[3] the circuit court granted Buck's motion for a directed verdict as to ROA's impossibility defense but denied the motion as to waiver and estoppel. However, the court later recognized the question of estoppel was not a jury question and directed a verdict for Buck on ROA's estoppel defense as well. *See Gaymon v. Richland Mem'l Hosp.*, 327 S.C. 66, 68,

---

[2] 424 S.C. 559, 570, 819 S.E.2d 131, 137 (Ct. App. 2018) (holding Innegrity's "claimed financial inability to perform cannot constitute impossibility" and Innegrity "assumed the risk it would be able to [perform its obligation under the contract], whether by making alternative arrangements with the lender or paying off the loan").

[3] 328 S.C. 585, 593, 493 S.E.2d 875, 879 (Ct. App. 1997) ("A party to a contract cannot be excused from performance on the theory of impossibility of performance unless it is made to appear that the thing to be done cannot by any means be accomplished, for if it is only improbable or out of the power of the obligor, it is not deemed in law impossible." (quoting 17A Am.Jur.2d *Contracts* § 674)).

488 S.E.2d 332, 333 (1997) ("[A] defense of equitable estoppel interposed in a law case should be tried by the court as an equitable issue.").

The case went to the jury only on the breach of contract claim. The jury returned a verdict for Buck, finding it had "proven damages by a preponderance of the evidence in the amount of $900.000." ROA filed a Rule 59(e), SCRCP motion to alter or amend, arguing impossibility excused ROA's failure to perform and the defenses of waiver and estoppel barred Buck's recovery. ROA also moved for JNOV and requested "an order finding, as a matter of law, ROA's failure to perform under the subject contract was excused pursuant to the doctrine of impossibility of performance." ROA further requested entry of judgment on the doctrines of waiver and estoppel. The circuit court denied the post-trial motions.[4]

**Law and Analysis**

"When reviewing the trial court's ruling on a motion for a directed verdict or JNOV, this [c]ourt applies the same standard as the trial court by viewing the evidence and all reasonable inferences in the light most favorable to the nonmoving party." *Maybank v. BB&T Corp.*, 416 S.C. 541, 568, 787 S.E.2d 498, 512 (2016). "The trial court must deny a motion for a directed verdict or JNOV if the evidence yields more than one reasonable inference or its inference is in doubt." *Id.* "Moreover, '[a] motion for JNOV may be granted only if no reasonable jury could have reached the challenged verdict.'" *Id.* at 568–69, 787

---

[4] ROA does not seek a new trial in this appeal; instead, ROA seeks entry of judgment in its favor on the defenses of impossibility, waiver, and estoppel. This request is complicated by the fact that ROA did not request a directed verdict before the circuit court on the question of impossibility, instead stating "we believe that issue should go to the jury." ROA now argues a directed verdict motion would have been futile in light of the circuit court's ruling in Buck's favor as to impossibility. We disagree. For the reasons discussed below, we find ROA's claim fails both procedurally and on the merits. *See e.g.*, *RFT Management Co., LLC v. Tinsley & Adams LLP*, 399 S.C. 322, 332, 732 S.E.2d 166, 171 (2012) (reiterating that "[a] motion for judgment notwithstanding the verdict is a renewal of the directed verdict motion and cannot raise grounds beyond those raised in the directed verdict" motion (quoting *Roland v. Palmetto Hills,* 308 S.C. 283, 286, 417 S.E.2d 626, 628 (Ct. App. 1992))).

S.E.2d at 512 (alteration in original) (quoting *Gastineau v. Murphy*, 331 S.C. 565, 568, 503 S.E.2d 712, 713 (1998)).

## I.     Impossibility

ROA argues the circuit court erred by directing a verdict for Buck on impossibility of performance.  ROA contends *Morin* is distinguishable because (1) the trial court in *Morin* submitted the impossibility defense to the jury; (2) the contract in *Morin* "contained an unconditional promise" to remove an employee as the guarantor, whereas here the clause only required a mortgage be removed "by paying an ascertainable sum of money"; and (3) PNC had absolute discretion to reject the sale.  ROA cites cases from other jurisdictions, *Serio v. Copeland Holdings, LLC*[5] and *Olbum v. Old Home Manor, Inc.*,[6] to support its impracticability argument. We find the circuit court properly directed a verdict on impossibility.

"A party to a contract must perform its obligations under the contract unless its performance is rendered impossible by an act of God, the law, or by a third party." *Hawkins*, 328 S.C. at 593, 493 S.E.2d at 879.  "Impossibility must be real and not a mere inconvenience."  *Id.*

> A party to a contract cannot be excused from performance on the theory of impossibility of performance unless it is made to appear that the thing to be done cannot by any means be accomplished, for if it is only improbable or out of the power of the obligor, it is not deemed in law impossible.

*Id.* (quoting 17A Am. Jur. 2 *Contracts* § 673, at 682 (1991)).  "Subjective impossibility, possibility which is personal to the promisor and does not inhere in the nature of the act to be performed, does not excuse nonperformance of a contractual obligation." *Moon v. Jordan*, 301 S.C. 161, 164, 390 S.E.2d 488, 490 (Ct. App. 1990); *see also id.* ("[T]he fact that one is unable to perform a contract

---

[5] 521 S.W.3d 131, 138 (Ark. Ct. App. 2017) (recognizing "[t]he law of impossibility has evolved into a broader and more equitable rule of impracticability" in Arkansas).

[6] 459 A.2d 757, 762–63 (Pa. Super. Ct. 1983) (referencing the Restatement 2nd's language addressing supervening impracticability in a case involving payment of mineral rights and unmineable coal).

because of his inability to obtain money, whether due to his poverty, a financial panic, or failure of a third party on whom he relies for furnishing the money, will not ordinarily excuse nonperformance in the absence of a contract provision in that regard.").

ROA bases its impossibility argument on the Contract's provision providing ROA was only required to remove an exception that "can be removed by paying an ascertainable sum of money such as mortgages" and on PNC's refusal to consent to the sale of the Property. But ROA's argument ignores Rice-Marko's own trial testimony supporting Buck's claim that she "and ROA knowingly and intentionally omitted and/or misrepresented facts concerning the status of the Property" when contracting for its sale.

Rice-Marko testified she was the owner, managing member, and sole member of ROA, LLC. When asked on direct examination whether she advised Buck of any financial impediment that might hinder closing, she responded, "I did not personally tell Mr. Buck, but it was recorded and it was also known to his attorney." However, upon further inquiry, Rice-Marko admitted that while the mortgage and forbearance agreement with PNC were recorded, she never disclosed to Buck that the note and mortgage were in default nor advised Buck of other financial difficulties that might hinder ROA's ability to sell the Property.

Buck's counsel introduced PNC's November 26, 2012 Notice of Default as well as a February 15, 2013 letter PNC's counsel sent to Rice-Marko just one month *prior* to ROA's entering the Contract, and Rice-Marko eventually admitted she did not notify Buck of this correspondence. Rice-Marko further admitted she knew Buck was attempting a 1031 exchange and even inquired through email as to the latest date Buck could close and satisfy any 1031 deadline. Still, even after the April 3 closing date had come and gone, Rice-Marko did not inform Buck of her financial difficulties with PNC because she "was continuing to negotiate. In fact, [she] had a counteroffer out to [PNC] at this time." Rice-Marko testified she did not appear at the closing "because the bank would not release the mortgage and note"—a fact she chose not to disclose to Buck. And, when Buck emailed Rice-Marko on April 5 to ask why the closing had not occurred as per the Contract, she admitted she was nonresponsive to his inquiry but continued to assert she was not having any difficulty with PNC because "we were getting along. We were negotiating."

Finally, Buck's counsel highlighted the "Representations and Warranties" section of the Contract, specifically provision 6(a)(ii), in which Rice-Marko and ROA represented, "To the best knowledge of the Seller[,] there is no actual or threatened

action, litigation, or proceeding (including, but not limited to, condemnation) by any organization, person, individual, or governmental authority against the Property, or with respect thereto." These representations were made despite the litigation threatened by PNC in the November 26, 2012 Notice of Default and the February 15 follow-up letter threatening to pursue "litigation to collect on the Notes, foreclosure of the Mortgages[,] and enforcement of the Guarantys [sic]."

Like the circuit court, we disagree with ROA's contention that PNC's unwillingness to consent to the sale of the Property presented a legal impossibility. As in *Morin*, ROA undertook the risk that it would be able to clear any encumbrances to the sale by paying an ascertainable sum of money, thus enabling it to sell the Property to Buck. *See Morin*, 424 S.C. at 570, 819 S.E.2d at 137 ("Even the most generous interpretation of impossibility will not save a contracting party who bargains for his own folly by guaranteeing performance despite impracticability."). Although Rice-Marko properly references *Serio* and *Olbum* in her argument, these cases from other jurisdictions are unpersuasive here. Arkansas and Pennsylvania have recognized an *impracticability* defense whereas South Carolina has not. *Compare Serio*, 521 S.W.3d. at 138 ("*Impracticability* of performance may excuse a party from performing contractual obligations." (emphasis added)), *and Olbum*, 459 A.2d 757 at 763 (utilizing an impracticability defense to support the court's decision), *with Morin*, 424 S.C. at 569–70, 819 S.E.2d at 137 (noting South Carolina has not expanded its impossibility defense to impracticability, other than as specified in the commercial code). Accordingly, the circuit court did not err in directing a verdict for Buck on ROA's impossibility defense.[7]

## II.    Waiver & Estoppel

ROA next asserts the trial court erred by denying its motion for JNOV based on

---

[7] Although pursuant to its global restructuring contract with PNC, the sum of money ROA may have had to pay to release the Property could have been in excess of $20 million, that option was still legally *possible*. *See Moon*, 301 S.C. at 164, 390 S.E.2d at 490 ("Subjective impossibility, possibility which is personal to the promisor and does not inhere in the nature of the act to be performed, does not excuse nonperformance of a contractual obligation."); *Morin*, 424 S.C. at 570, 819 S.E.2d at 137 (emphasizing an individual's financial difficulties do not constitute legal impossibility). As the circuit court recognized, Rice-Marko presented no evidence of her financial condition, choosing merely to reiterate she and PNC "were negotiating."

waiver and estoppel. Specifically, ROA contends the Contract required Buck to inspect the title and identify any exceptions. ROA further contends Buck should be precluded by the doctrines of waiver and estoppel from recovering for ROA's breach because Buck failed to demand evidence of PNC's consent to the sale. We disagree.

> A waiver is a voluntary and intentional abandonment or relinquishment of a known right. Generally, the party claiming waiver must show that the party against whom waiver is asserted possessed, at the time, actual or constructive knowledge of his rights or of all the material facts upon which they depended.

*Janasik v. Fairway Oaks Villas Horizontal Prop. Regime*, 307 S.C. 339, 344, 415 S.E.2d 384, 387–88 (1992). "Waiver is a question of fact for the finder of fact." *Mac Papers, Inc. v. Genesis Press, Inc.*, 426 S.C. 393, 404, 826 S.E.2d 874, 880 (Ct. App. 2019) (quoting *Parker v. Parker*, 313 S.C. 482, 487, 443 S.E.2d 388, 391 (1994)). "Waiver is distinct from equitable estoppel in that no detrimental change of position in reliance on conduct need be shown. In [a] waiver analysis[,] the focus is upon whether there was an unequivocal intent to relinquish a known right." 7 S.C. Jur. *Estoppel and Waiver* § 17 (1993).

"In its broadest sense, equitable estoppel is a means of preventing a party from asserting a legal claim or defense that is contrary or inconsistent with his or her prior action or conduct." *Rodarte v. Univ. of S.C.*, 419 S.C. 592, 601, 799 S.E.2d 912, 916 (2017) (quoting 28 Am. Jur. 2d *Estoppel and Waiver* § 27 (2011)). "Essential elements of estoppel as related to the party claiming the estoppel are: (1) lack of knowledge and of means of knowledge of truth as to facts in question; (2) reliance upon conduct of the party estopped; and (3) prejudicial change in position." *Zabinski v. Bright Acres Assocs.*, 346 S.C. 580, 589, 553 S.E.2d 110, 114 (2001). "The essence of equitable estoppel is that the party entitled to invoke the principle was misled to his injury." *S.C. Pub. Serv. Auth. v. Ocean Forest, Inc.*, 275 S.C. 552, 554, 273 S.E.2d 773, 774 (1981). "Estoppel cannot exist if the knowledge of both parties is equal and nothing is done by one to mislead the other." *Mac Papers*, 426 S.C. at 404, 826 S.E.2d at 880 (quoting *Evins v. Richland Cnty. Hist. Pres. Comm'n*, 341 S.C. 15, 20, 532 S.E.2d 876, 878 (2000)).

Here, the circuit court did not err in denying ROA's JNOV motion as to waiver and estoppel for at least two reasons. First, a reasonable jury could have found (and did find) that Buck had not waived its rights. Rice-Marko's own testimony and emails demonstrate ROA was continually attempting to negotiate with PNC to sell

the Property by May 2013, and Buck was actively seeking to purchase it. The contract provided: "The failure of either Party to exercise any power given any Party hereunder or to insist upon strict compliance by either Party of its obligations hereunder, shall not constitute a waiver of either Party's right to demand exact compliance with the terms hereof." We acknowledge ROA's argument that Buck waived its rights by not proceeding with the title inspection and exception process set forth in the contract, but this, at best, presented an issue for the jury in considering the breach of contract cause of action. *See Parker*, 313 S.C. at 487, 443 S.E.2d at 391 ("Waiver is a question of fact for the finder of fact."). Notably, the closing date specified in the contract had passed one month before PNC initiated the foreclosure action and, even then, Rice-Marko had not disclosed either the financial difficulties or PNC's refusal to consent to the sale. Buck correctly notes that while its title examination revealed the PNC mortgage and forbearance agreement, it did not reveal the default letters that preceded its execution of the Contract. ROA was the only party with knowledge of the true state of the mortgage and the foreclosure threat, and Rice-Marko admitted she did not disclose this to Buck, despite the Contract's obligation that she do so. Thus, the circuit court did not err in denying ROA's JNOV motion as to waiver.

Nor did the circuit court err in addressing ROA's estoppel defense. ROA's estoppel defense failed because "[e]stoppel cannot exist if the knowledge of both parties is equal and nothing is done by one to mislead the other." *See Zabinski*, 346 S.C. at 589, 553 S.E.2d at 114 (quoting *Evins*, 341 S.C. at 15, 532, S.E.2d at 878). Here, ROA was the party holding the knowledge—it knew of PNC's mortgage and position on the Property, ROA's and Rice-Marko's financial difficulties, and its own contractual obligation to remove mortgages that could be paid off by an ascertainable sum of money. Buck consistently set forth its intention to purchase the Property. Even though Buck speculated there was some lender issue at play, there was no evidence Buck attempted in any way to mislead ROA; indeed, the only evidence in the record demonstrates ROA likely violated provision 6(a)(ii) in failing to disclose its cross-collateralization hurdle.

Accordingly, the circuit court did not err in directing a verdict for Buck on ROA's equitable estoppel defense or in denying ROA's motion for JNOV.

**AFFIRMED.**

**KONDUROS and GEATHERS, JJ., concur.**